## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## (BALTIMORE)

| | | |
|---|---|---|
| ORRSTOWN BANK | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. 1:12-CV-00345-RDB |
| ARES INVESTMENTS GROUP, et al., | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF MOTION TO VACATE OR,
## IN THE ALTERNATIVE, TO OPEN CONFESSED JUDGMENTS

Defendants Ares Investment Group, LLC ("Ares"); Aristaeus, LLC ("Aristaeus"); Aristodemos Capital Group, LLC ("Aristodemos"); Ariston Real Estate Group, LLC ("Ariston"); Catania USA, LLC ("Catania"); Have A Bowl, LLC ("Have A Bowl"); Northwind Townhomes, LLC ("Northwind"); Polar, LLC ("Polar"); and Ugo, LLC ("Ugo") (collectively, the "Entity Defendants" or, alternatively, the "Azadi Entities"), and Morris Azadi ("Morris"), Ash Azadi ("Ash"), and Simin Azadi ("Simin") (collectively, the "Individual Defendants" or the "Azadis" and together with the Entity Defendants, collectively, the "Defendants"), by their undersigned counsel, submit this Memorandum in Support of Motion to Vacate or, in the Alternative, to Open Confessed Judgments (the "Memorandum") and state as follows:

### I. OVERVIEW

The Defendants are entitled to have this Court vacate the confessed judgment entered in the above-captioned case because the confessed judgment pleading fails to provide requisite specificity of the claim, even on such basic elements as the method by which interest and attorneys' fees were

calculated.  Additionally, the disclosure of confidential information in the initial pleading requires a striking of the pleading and, therefore, a vacating of the confessed judgment.  Lastly, if the Court were not to construe the Defendants' alleged obligations as released or the underlying complaint otherwise barred, the Defendants have a claim in contract and/or tort, thus are entitled to a set-off of the obligations alleged in the Complaint for Confession of Judgment and Breach of Contract (the "Complaint"), which requires vacating or, at a minimum, opening the confessed judgments entered upon the Complaint.

## II.  FACTUAL BACKGROUND

The Azadis, in an effort to better their well-being and that of their successive generations in the United States, entered into the real estate ownership and development field in about 2005.  *See* Affidavit of Ash Azadi Affidavit at  ¶ 3 (the "Ash Azadi Affidavit").  The Ash Azadi Affidavit is attached hereto as **Exhibit 1**.   Ash and Morris are, first and foremost, airline pilots; they are not sophisticated real estate developers.  Ash Azadi Affidavit at ¶ 4.  Simin is a housewife.  Ash Azadi Affidavit at ¶ 5.  The Azadis, in 2002, first acquired the Maryland Historical Society-registered property known as the Governor Hamilton Hotel, located at 90-98 West Washington Street, Hagerstown, Maryland.[1]  Ash Azadi Affidavit at ¶ 6.  Then, Morris and his wife, Simin, acquired two properties, one at 818 Bowman Avenue, which eventually they transferred to Ariston.  Ash Azadi Affidavit at ¶ 7.  (A year later, in May 2006, Ariston acquired 830 Bowman Avenue.  Ash Azadi Affidavit at ¶7.)     In about March 2006, the Azadis, through their entity Ares, purchased South Cleveland Plaza, an office building located at 201 South Cleveland Avenue (the "Cleveland Avenue Property").   Ash Azadi Affidavit at ¶ 7.  Orrstown Bank (hereinafter, alternatively,

---

[1] Unless otherwise noted, all addresses are located in Hagerstown, Maryland.

"Orrstown," the "Bank" or the "Plaintiff") was a tenant in the building at that time.  Ash Azadi Affidavit at ¶ 7.  They also acquired, in 2005, 18-20 West Washington Street and, in 2006, 535 Northern Avenue through Ares. Ash Azadi Affidavit at ¶ 8.

Glad to seize upon an opportunity, Orrstown's Vice President of Commercial Lending, Terry Reiber ("Reiber"), welcomed the Bank's new landlord at the Cleveland Avenue Property and advocated that Ares and the Azadis refinance all of their real estate holdings with Orrstown.  Ash Azadi Affidavit at ¶ 9.  Impressed with the seemingly open arms of Orrstown and wooed by Reiber, Ares and the Azadis accepted the invitation to refinance with Orrstown.  Ash Azadi Affidavit at ¶10.

The Azadis' relationship with Orrstown continued and, in 2009, the Bank financed Aristodemos' acquisition of the land and existing improvements located at 19330 Leitersburg Pike (the "Bowling Alley Property"), destined to be developed into a family entertainment and recreation center, with a bowling alley, an arcade and a bar and restaurant (the "Bowling Center") as well as the development of luxury townhouses by Northwind, in Falling Waters, West Virginia.  Ash Azadi Affidavit at ¶ 11.  The Bowling Alley Property also was designed to have attached office space, fronting Oak Hill Avenue.  Ash Azadi Affidavit at ¶ 12.  At the time, however, Orrstown refused to finance the operating entity's, Have A Bowl, activities at the Bowling Alley Property, mainly the renovation to create the Bowling Center.  Ash Azadi Affidavit at ¶ 13.

In January 2010, the Azadis' fortunes and their entities' took a negative turn.  Ash Azadi Affidavit at ¶ 14.  Orrstown abandoned its space in the Cleveland Avenue Property, leaving a gaping hole in Ares' and the Azadi Entities' combined income stream.  Ash Azadi Affidavit at ¶ 14.  At or about the same time, Ash Azadi communicated to Orrstown loan officer Brian Selders

("Selders") that the Azadi Entities foresaw financial issues looming due to losses of commercial tenants and an inability to find financing for the recreation center on the Bowling Alley Property. Ash Azadi Affidavit at ¶ 14.  Then, on June 13, 2010, Ash Azadi sent an electronic mail note to Jeffrey Embly, the Bank's CFO ("Embly"), reiterating the Azadi Entities' precarious financial position and the method for resolving the difficulty (the "June 13, 2010 Email").  Ash Azadi Affidavit at ¶ 15.  A true and accurate copy of the e-mail to Embly is attached hereto and incorporated herein by reference as **Exhibit 2**.

The June 13, 2010 Email specifically urged a decision from the Bank on whether it would provide funding to complete the Bowling Center and another Azadi Entity project, the renovation of the former Hamilton Hotel into a retail, office and residential condominium complex (the "Hamilton Project").  Ash Azadi Affidavit at ¶ 16.  The Hamilton Project was eligible, and since has qualified, for a tax credit of $767,367, while the outstanding funds needed to complete it was under $600,000. Ash Azadi Affidavit at ¶ 16.  Fortunately, some months later, in January of 2011, the Bank provided additional funding to allow the Azadi Entities to complete the construction of the Bowling Center and extended credit to allow the Hamilton Project to be completed.  Ash Azadi Affidavit at ¶ 17.  In June of 2011, the Bank continued to work with the Azadis and their entities, through the Bank's credit team of Selders, Jeff Gayman and Michael Moore.  Ash Azadi Affidavit at ¶ 18. The Bank's credit team provided continuous assurances that it would work with the Azadis and the Azadi Entities and the Bank cultivated a bond of trust and confidence that the Bank would help the Azadis and the Entity Defendants complete their projects and the Defendants did repose trust and confidence in the Bank.  Ash Azadi Affidavit at ¶19.

In late July 2011, Selders introduced John Nickey and a new hire of Orrstown, Terry Miller ("Miller").  Ash Azadi Affidavit at ¶ 20.  At that meeting, which Ash Azadi attended, the Defendants reminded the Bank that a Small Business Administration loan in excess of $1.1 Million (the "SBA Loan") was imminent, but that a notice of default from the Bank would jeopardize the loan.  Ash Azadi Affidavit at ¶ 20.  During this meeting, Miller specifically reassured the Azadis and, through them, their entities, that the Bank would allow them time to stabilize their projects and finances and the Bank would honor its commitment to fund the draw requests for the completion of the Bowling Center.  Ash Azadi Affidavit at ¶20.  At the time, there was approximately $800,000 in available funds under the credit facility for the Bowling Center project.  Ash Azadi Affidavit at ¶ 20.

Accordingly, the Azadi Entities continued to pursue the construction of their projects, most notably the Bowling Center, committing to pay contractors on the jobsites and incurring the obligations related thereto.  Ash Azadi Affidavit at ¶ 21.  The Bank's consulting architect reviewed and approved the work performed at the Bowling Alley Property.  Ash Azadi Affidavit at ¶ 22.

In August 2011, the Azadis met, again, with Miller, and provided construction draw requests for payment of subcontractors on the Bowling Center (for which an occupancy permit issued on August 24, 2011).  Ash Azadi Affidavit at ¶ 23.  Despite assurances from Miller that Orrstown would work with the Azadis and the Azadi Entities, however, without advance notice, and just days before the scheduled opening of the Bowling Center, Miller only authorized a portion of the draw requests to pay subcontractors and declined to fund draw requests, despite the approval by the Bank's architectural consultant.  Ash Azadi Affidavit at ¶ 24.  Specifically, despite available funds under the credit facility with Orrstown, the Bank only funded, in round numbers, $65,000

owed to Brunswick Bowling Centers, $14,000 to the company that installed the arcade game machine card system and $41,500 to the roofer whose invoice was not due, in full, for six months. Ash Azadi Affidavit at ¶25.   Orrstown declined to fund the electrician, Olympia Electric, the HVAC contractor or the invoice for the flooring subcontractor.[2]   Ash Affidavit at ¶ 26.   Thus, the Azadis were forced to choose between paying the subcontractors, for whom draw requests were denied, from personal funds, to the extent available, or risk the unpaid subcontractors walking off the job, refusing to honor warranties or filing suit.   Ash Azadi Affidavit at ¶ 26.   The Bank prohibited the Azadi Entities from paying in excess of $130,000 for work actually performed at the Bowling Center.   Ash Azadi Affidavit at ¶ 26.   Morris Azadi paid approximately $30,000 from his personal funds or funds drawn from personal lines of credit at other banks.   Ash Azadi Affidavit at ¶ 27.   Many of those subcontractors the Azadis could not pay did walk-off the job and some have refused to honor warranties applicable to their work.   Ash Azadi Affidavit at ¶ 28.   Olympia Electric has gone the extra step, suing Aristodemos and Ash Azadi, personally. Ash Azadi Affidavit at ¶ 29.   Consequently, the Defendants' businesses, personal fortunes and business reputations have been damaged and diminished.   Ash Azadi Affidavit at ¶ 30.   Likewise, the Defendants used another $50,000 of personal funds to cover the opening expenses for the Bowling Center.   Ash Azadi Affidavit at ¶ 27.

Only one week after Miller gave specific assurances that the Bank would work with its borrowers to allow for the projects to stabilize, Miller pulled the proverbial rug out from under them and, on August 26, 2012 issued default notices to the Azadi Entities and the Azadis.   Ash

---

[2] Flooring for the Bowling Center was ordered through the Azadis' Catania entity so as to take advantage of its ability to purchase materials at a favorable wholesale cost.   Ash Azadi Affidavit at ¶ 26.   A wholly independent installation subcontractor installed the flooring, but remains unpaid because Orrstown refused to fund the draw request.   Ash Azadi Affidavit at ¶ 26.

Azadi Affidavit at ¶ 31; *see, e.g., Complaint Exhibits 3A, 3B, 3C, 3D and 3E*.  The default notices immediately jeopardized the SBA Loan for over $1.1 Million that the Azadis had secured for the Bowling Center and substantially would have reduced the Defendants' alleged debt to the Bank. Ash Azadi Affidavit at ¶ 32.  The Azadis made full disclosure to the Bank about the SBA Loan and the Bank knew that its action jeopardized the SBA Loan, but Miller and the Bank did not care.  Ash Azadi Affidavit at ¶ 33.  Instead, Orrstown refused to fund any more project work, including the Bowling Center that stood on the precipice of opening and generating revenue in a few weeks and the Hamilton Project that would generate over $170,000 of net revenue from the historic tax credit, that was going to be paid over to the Bank.  Ash Azadi Affidavit at ¶ 34.  But for Orrstown's precipitous actions, the Azadi Entities, would have been able to pay, approximately, $1.8 Million to the Bank, which would have been realized from the SBA Loan and the gross amount of the tax credit on the Hamilton Project.  Ash Azadi Affidavit at ¶ 35.  Instead, the Azadis are indebted to contractors, they have had to pay personal funds, have not yet received the proceeds of the SBA Loan or the historic tax credit and have had to shut down the Hamilton Project.  Ash Azadi Affidavit at ¶ 36.

Contrary to its undertaking, promises and assurances to work with the Azadis and their entities, the Bank has declined to fund the projects, thereby frustrating the essence of the deals negotiated with the Bank.  Ash Azadi Affidavit at ¶ 37.

### III.  ARGUMENT

**A.**     **<u>Standard for Vacating Confessed Judgments</u>**

"Because the widespread practice of including a provision authorizing a confessed judgment in promissory notes lends itself to fraud and abuse, "[the Court of Appeals of Maryland]

has made clear that judgments by confession are to be freely stricken out on motion to let in defenses.'" *Schlossberg v. Citizens Bank of Maryland,* 341 Md. 650, 655, 672 A.2d 625, 627 (1996)(quoting, *inter alia, Keiner v. Commerce Trust Co.,* 154 Md. 366, 141 A. 121, 123 (1927)). If the defendant/movant "has a potentially meritorious defense to the confessed judgment complaint . . . [sic] the rule requires the court to order that the confessed judgment be opened, modified or vacated so that the defendant can file a responsive pleading to the plaintiff's complaint and the merits can be determined. *Id.* at 656, 672 A.2d at 627-28. *See also Gelzer v. Scamoni* 238 Md. 73, 207 A.2d 655 (1965) (set-off is a meritorious defense).

The liberality with which confessed judgments are to be vacated and the constraints on a trial judge's discretion in refusing to vacate confessed judgments is clear. *See, e.g., Gambo v. Bank of Maryland,* 102 Md. App. 166, 648 A.2d 1105 (1994). In *Gambo,* the Court of Special Appeals of Maryland reversed the trial judge's refusal to grant a motion to vacate and vacated the confessed judgment itself. *Id.* at 185-88, 648 A.2d at 1114-15. The *Gambo* court held that the confessed judgment should have been vacated because the affidavit filed by the defendant, which simply endorsed the assertions in the motion to vacate, alleged that the plaintiff sold the collateral at issue in the principal case for less than the appraised value and that a public auction would have brought a greater amount of money. *Id.* at 187, 648 A.2d at 1115. Conversely, the plaintiff, in *Gambo,* set forth in great detail the steps it took to find a purchaser for its collateral and an explanation as to why the sale was commercially reasonable. *Id.,* 648 A.2d at 1115. Nonetheless, the Court of Special Appeals concluded that the issues regarding the disposition of the collateral were precisely of the type which the parties are entitled to litigate. *Id.,* 648 A.2d at 1115.

In *Alger Petroleum, Inc. v. Spedalere,* 83 Md. App. 66, 573 A.2d 96, *cert. denied*, 320 Md. 800, 580 A.2d 219 (1990), the Court of Special Appeals also reversed the trial judge for failing to open a confessed judgment when the motion to vacate was not timely filed, but an answer to the complaint for judgment by confession was filed instead.   The court found that the trial judge had abused his discretion in failing to open the confessed judgment. *Id.* at 84, 573 A.2d at 432.   As the courts of Maryland routinely recite, the courts should liberally strike confessed judgments:  "In the usual case, the elements of defense are made out in affidavits and if these amount to a *prima facie* defense *or disclose an apparent conflict in evidence as to the merits of the case,* the court should liberally exercise its equitable jurisdiction, vacate the judgment, and permit a trial on the merits." *Id.* at 81, 573 A.2d at 431 (quoting *Katski v. Boehm,* 249 Md. 568, 583-84, 241 A.2d 129, 138 (1968) (citations omitted)) (emphasis added).

That the defendant only need establish a defense which is legally cognizable in order to have a confessed judgment opened, modified or vacated is clear.  *See Shafer Bros. v. Kite,* 43 Md. App. 601, 406 A.2d 673 (1979).   In *Kite,* the plaintiffs had filed confessed judgment complaints against the defendants.  *Id.* at 602, 406 A.2d at 675.   The defendants filed motions to vacate the confessed judgments arguing i*nter alia* that the person who had signed the confessed judgment notes did not possess the authority to sign such notes, even though that person was a partner of the defendant partnership and had been vested with authority to sign other notes for the defendant.  *Id.* at 602-04, 406 A.2d at 675-76.   The trial judge denied the motions to vacate and was reversed on appeal. *Id.* at 604, 406 A.2d at 676.   After concluding that a partner of a partnership is not authorized to sign a confession of judgment on behalf of the partnership, unless actually authorized to do so, the Court of Special Appeals held that the motion to vacate should have been granted

- 9 -

because there was some sworn testimony that the person signing the confessed judgment note did not have actual authority to do so from all of the partners of the defendant partnership. *Id.* at 609, 406 A.2d at 678.  That testimony alone satisfied the defendant's burden of establishing a *prima facie defense* to the note. *Id.,* 406 A.2d at 678.  Although the plaintiffs argued that the signing partner had authorization to sign confessed judgment notes for other lenders, thus necessarily had authority to sign the ones considered in the principal case, the court disagreed. *Id.,* 406 A.2d at 678. The Court of Special Appeals held that "at best, a question of fact was raised ...." *Id.,* 406 A.2d at 678.

A meritorious defense goes not only to the execution of the underlying note, but to the amount due on the note as well.  *See Nils, LLC v. Antezana*, 171 Md. 717, 730, 912 A.2d 45, 52-53 (2006) (ultimately affirming grant of confessed judgment).  Likewise, *"evidence of a valid set-off* constitutes a meritorious defense requiring the judgment to be opened." *Id.*, 912 A.2d at 53 (quoting *Gelzer v. Scamoni*, 238 Md. 73, 207 A.2d 655 (1965)) (emphasis in original).  Likewise *"an assertion that the movant is entitled to a credit may well entitle the moving party to have the matter submitted to a trier of fact."  Id*., 912 A.2d at 53 (quoting *Cropper v. Graves*, 216 Md. 229, 139 A.2d 721 (1958)) (emphasis in original).

As set forth herein below, the Defendants state a meritorious claim against the Bank, entitling it to a vacating of the confessed judgments or, at least, an opening of the confessed judgment.

**B.**      **Lack of Specificity Precludes Confession of Judgment**

Orrstown fails to provide the requisite specificity in its supporting papers to allow for the entry of judgment by confession; accordingly, the Court should vacate the confessed judgments entered in the above-captioned action.  This Court's Local Rules provide:

1.      Judgment by Confession

    a)   Complaint, Related Documents, and Attachments

> A complaint requesting the entry of judgment by confession shall be filed by the plaintiff accompanied by the written instrument authorizing the confession of judgment and entitling the plaintiff to a claim for liquidated damages and supported by an affidavit made by the plaintiff or someone on that party's behalf ***stating the specific circumstances*** of the defendant's execution of said instrument and including, where known, the age and education of the defendant, and ***further including the amount due thereunder***, and the post office address (including street address if needed to effect mail delivery) of the defendant.

Local Rule 108 (emphasis added).[3]

As to the "specific circumstances" of the execution of each alleged document, the Bank and the Affidavit [of Terry Miller], attached as Exhibit 4 to the Complaint (the "Miller Affidavit"), are silent.   In the Complaint's 186 paragraphs of verbiage with contorted recitations, there is no explanation of the genesis of each document, let alone in the Miller Affidavit.  All the Complaint alleges is that the Bank "extended numerous commercial loans and lines of credit" for the two real estate development projects in or new Hagerstown, Maryland . . . ."  *See* Complaint at ¶¶ 8-9.  The recitations that follow constitute a confusing series of allegations without explanation of what gave

---

[3] Maryland's Rule of Civil Procedure is instructive as to the substantive handling of confessed judgments as well:

> [b] **Action by Court**.  If the court determines that (1) the complaint complies with the requirements of section (a) of this Rule and (2) the pleadings and papers demonstrate a factual and legal basis for entitled to a confessed judgment, the court shall direct the clerk to enter the judgment. ***Otherwise, it shall dismiss the complaint***.

rise to each note, guaranty and loan document or precisely how each successive document specifically related to other documents.  Likewise, Orrstown provides  no further background.  The Miller Affidavit does nothing to amplify the Complaint.  Indeed, it fails to give the specific ages of the Azadis, a requirement of Local Rule 108, but merely states they are adults.  *See* Miller Affidavit at ¶ 6.  Presuming the "specific circumstances" mean just that, the Miller Affidavit is deficient, requiring the vacating of the confessed judgments.

While the Local Rules of this Court do not provide much specific guidance as to what the affidavit in support of a confessed judgment complaint must contain, Maryland law, which provides the substantive rules of decision for the action, provides, at least, recommended guidance.[4]  In particular, the Maryland Rules recommended form affidavit particularizes the information that must be included.  Of note, as set forth in Maryland Rule 2-611(a), if the total amount claimed is something other than the face amount of the instrument upon which the suit is brought, the affiant must set forth how the total claim is computed.  *See* Maryland Rule 2-611(a)(5) (Michie 2012).  It is not enough to show a simple breakdown of the principal, interest, and attorneys' fees; rather, the affiant must ***"[s]tate the dates and amounts of all payments made and show the computation of all interest and attorneys' fees claimed***."  *Id*.  (emphasis added).  This requirement dovetails with the Local Rule's requirement that the amount due under the note be detailed.

Amidst the morass of recited notes, agreements, guaranties and the like and the summary listing of the amounts allegedly due, the Miller Affidavit simply does not provide the requisite information.  There is no statement of any payments made on a single one of the alleged credit

---

Maryland Rule 2-611(b) (Michie 2012) (emphasis added).

[4] *See Erie R.R Co.. v. Tompkins,* 304 U.S. 64 (¶38) (in diversity cases, federal courts apply the law of the State which provides the rules of diversity.

facilities *See* Complaint Exhibit 4, Miller Affidavit.   The Miller Affidavit does not set forth the interest rate for any one of the notes or how the interest and late charges were calculated.   Similarly, while the appraisal fees and attorneys' fees are set forth, they are included in summary form only, with no support given detailing the fees.

Even the Complaint itself does not educate the Court or the Defendants how the interest is calculated; the calculation of interest is not shown, other than a plain recitation of alleged per diem interest without reference to the governing interest rate or rates over time as they may have changed.   Likewise, the Complaint does not show how even a single payment was applied to the debt.[5]   Accordingly, an accurate statement of the amount due escapes verification.   That alone should be fatal to the entry of a confessed judgment.   *See First Mtg. Bond Homestead Ass'n, Inc. v. Mehlhorn*, 133 Md. 439, 450-51 (1919) (sustaining circuit court's refusal to enter judgment by confession where the amount to which the plaintiff is entitled is not certain).

Similarly, Orrstown's claim for attorneys' fees lacks the requisite support.   Orrstown asserts in its Complaint, without any further back-up, that it is entitled to $132,753.14 for attorneys' fees for drafting its Complaint and the brief accompanying Miller Affidavit and a proposed Order.   *See* Complaint at ¶ 16 and n.3.   The Miller Affidavit provides no further guidance as to how the attorneys' fees were derived.   Noticeably absent is an affidavit from the Bank's counsel stating that the fees sought are reasonable, let alone one specifically reflecting the hours worked, the hourly rates charged and allocating the fees attributable to each alleged note or guaranty.

While the Bank tries to minimize the problem of claiming it merely allocated the attorneys' fees pro rata to each of the identified loan numbers [*See* Miller Affidavit, Complaint Exhibit 4 at ¶

9], the methodology is not necessarily reflective of the work performed to file the action against the specific obligors under a given note, thus opening the door to overcharging an alleged obligor for the sake of convenience.  As the Court of Special Appeals of Maryland recently has emphasized, attorneys' fees must satisfy the principle of indemnification and the amount of the fee awarded must be reasonable.  *Suntrust Bank v. Goldman*, 201 Md. App. 390, 398-401, 29 A.3d 724, 728-30.

Ensuring that lender's counsel does not receive excess fees is clear from the oft-cited *Garliss v. Key Fed. Sav. Bank*, 97 Md. App., 96, 627 A.2d 64 (1993).  The *Garliss* court vacated a confessed judgment entered against the appellant-borrower and remanded the case so the trial court could determine whether the net fees realized by the bank exceeded the amount to which it was entitled.  *Id.* at 106, 627 A.2d at 69.  Maryland's intermediate appellate court directed the court below to satisfy itself that "improper advantage was not taken of" the borrower.  *Id.*, 627 A.2d at 69.

Similarly, at bar, with respect to the calculation and attribution of attorneys' fees, as well as the calculation of the total amount due, this Court should protect the Defendants from the Bank taking improper advantage of them through overstated attorneys' fees, interest calculations and other charges.

Thus, because the Miller Affidavit fails to comply with all of the requirements of the confessed judgment rule, one failure being fatal, the confessed judgments should be vacated.

## C.    Wrongful Use of Confidential Information

The confessed judgments should be stricken because the Bank's pleading should be stricken in its entirety due to Orrstown's failure to redact confidential information from the papers, including

---

[5] Defendants note that the Miller Affidavit also fails to set forth disclaimers required under Maryland law.  *See* Maryland Rule 2-611(a)(7), (8) and (9) – the specific disclaimers that none of the instruments relate to consumer loans, a consumer

loan account numbers, employer identification numbers of the Entity Defendants and Social

Security Numbers of the Individual Defendants.

Rule 5.2 of the Federal Rules of Civil Procedure provides:

> (a) **Redacted Filings**.  Unless the court orders otherwise, in an electronic or paper filing with the court that contains an individual's social-security number, taxpayer-identification number, or birth date, the name of an individual known to be a minor, or a ***financial-account number***, a party or nonparty making the filing may include only:
>
> (1) ***the last four digits of the social-security number and taxpayer-identification number***;
> (2) the year of the individual's birth;
> (3) the minor's initials; and
> (4) ***the last four digits of the financial account number***.

Fed. R. Civ. P. 5.2(a) (emphasis added).

Additionally, Local ECF Electronic Filing Requirements and Procedures for Civil Cases

(the "ECF Procedures Manual") provides:

> A.     Information to be Redacted
>
> In accordance with Fed. R. Civ. P. 5.2, the parties ***must refrain from including or must redact the following information from all documents not submitted under seal***:
>
> - Full Social Security numbers. If an individual's Social Security number must be included in a document, only the last four digits of the number should be used.
>
> - Taxpayer identification numbers. If an individual's taxpayer identification number must be included in a document, only the last four digits of the number should be used.
>
> - Full financial account numbers. If financial account numbers are relevant, only the last four digits of the number should be used.

ECF Procedure Manual at § IV.A (emphasis added).

---

transaction or one subject to the Maryland Retail Installment Sales Agreement.

Failure to follow the specific guidelines tailored precisely to protect the confidential information that is a target for identity thieves and unscrupulous others allows the Court to strike the offending pleading, motion or paper.

      B.    Enforcement

> ***It is the responsibility of counsel and the parties to redact these personal identifiers***. The clerk will not screen documents and will not reject them solely on the basis that they contain personal identifiers.
>
> However, on its own initiative ***or at the request of a party, the court may strike the document*** or direct other corrective action and/or impose sanctions on any party failing to redact such information.

Id. at §IVB. (emphasis added).

At bar, Orrstown filed reams of paper with financial account numbers.  The entire Complaint repeats each loan account number.  The attached exhibits go one step further; many broadcast the Social Security numbers of the Individual Defendants and the Employer Identification Numbers, *i.e.* the tax identification numbers, of the Entity Defendants for all to see. *See, e.g*., Complaint Exhibits 1A, 1B and 1F.

This Court should sanction the unmitigated violation of the confidentiality provisions by striking the Complaint in its entirety as there is no way to fix the document replete with the improper disclosures.  Necessarily, the striking of the lone pleading, the Complaint, requires a vacating of the judgments by confession and dismissal of the action.[6]  Moreover, to the extent only one or more of the Defendants have been damaged by the improper publication of the confidential

---

[6] Alternatively, this Court may sanction Orrstown, pursuant to the ECF Procedures Manual, by vacating the confessed judgments and ordering corrective action to the extent any is deemed possible.

information, such damage would constitute a set-off against Orrstown's claims, necessitating a vacating of the confessed judgments.

**D.     The January 12, 2011 Purported Loan Modification Agreement Not Supported By Consideration Thereby Precluding Confessed Judgment Thereon.**

It is axiomatic that an agreement must be supported by consideration.  *See generally Cheek v. United Health Care*, 378 Md. 139, 147-48, 835 A.2d 656, 661 (2003) (contracts ordinarily require consideration); *Born v. Stancills, Inc.*, 214 Md. 443, 453, 135 A.2d 843, 848 (1957) ("[E]xtension agreements not supported by . . . consideration, even if made, would not be enforceable contracts." ); *see also Willis v. Countrywide Homes Loans Serv., L.P.*, 2010 U.S. Dist. LEXIS 72078 *5-6 (D.Md. July 19, 2010).  At bar, at least one of the alleged obligations is not supported by consideration; consequently, judgments confessed thereon should be vacated.

Specifically, with respect to the liability of Ares, Aristodemos, Ariston, Polar and Northwind under an alleged loan modification agreement dated January 12, 2011 (Bates-stamp numbered OT0149 through OT0158, purportedly with respect to Loan No. ******9010), the agreement is void for lack of consideration.  That agreement recites that there existed a prior loan agreement dated June 9, 2008 between Morris and Ash, on one hand, and the Bank, on the other, in the amount of $500,000 which was guaranteed, originally, by Ariston, Catania and Aristaeus.  *See* Complaint Exhibit 2G at OT0149.  The terms of the purported January 12, 2011 modification agreement garners additional guarantors (namely Ares, Aristodemos, Polar and Northwind), for the benefit of the Bank and enumerates alleged ratifications and acknowledgements from the Azadis and certain of their entities, but does not even purport to give anything back to the Defendants.[7]

---

[7] Indicative of the Byzantine deal structures and loan documents, the January 12, 2011 modification agreement  in the same paragraph refers to Ariston as a preexisting guarantor and as an assuming (or new) guarantor.  *See* Complaint Exhibit 2G at OT0149.  The signature pages reflect Ariston as an existing guarantor.  *See* Complaint Exhibit 2G at

Accordingly, judgment by confession as against Ares, Aristodemos, Ariston, Polar and Northwind, under an alleged loan modification agreement dated January 12, 2011 (Bates-stamp numbered OT0149 through OT0158), purportedly with respect to Loan No. ******9010 should not be countenanced and this Court should vacate the confessed judgments entered against those Entity Defendants.

## E.      **Orrstown Violated Its Duties to Defendants.**

A lender may be liable to its borrower under certain circumstances such as when the borrower reposes trust and confidence in the lender (*see Jacques v. First Nat'l Bank*, 307 Md. 527, 515 A.2d 756 (1986)) or when it violates the implied covenant of good faith and fair dealing implied into every contract.  At bar, the Bank's actions in refusing to fund the loans, despite direct representations to the contrary, and abrogating Defendants' ability to obtain the SBA Loan and an assured tax credit for their projects frustrated the very purpose of the lending relationship – to complete their real estate projects and pay the Bank.

Orrstown's relationship with the Defendants goes back to when Reiber first sought-out the Azadis to get their business.  Throughout the financial downturns of the economy and the Defendants' issues, the Bank continued to assure the Defendants it would work with them.  Even when Miller took the primary role in handling the relationship with the Defendants' credit facilities, he specifically represented that the Bank would work with them.  The Bank's architectural inspector approved work in the Bowling Center, clearing the way for draws to be funded.  Instead, contrary to the assurances of July and August 2011 that spurred the Defendant to work hard to complete their projects and to line-up resources that they would use to pay to the Bank –

---

OT153.  Thus, the Bank, cannot even keep straight who owes what to whom and under which document.  Accordingly, confessed judgments should not be allowed to stand on the Bank's proffered documents.

approximately $1.8 million-- the Bank suddenly terminated funding and demanded payment of all of the alleged indebtedness.  As a result, the Hamilton Project has come to a standstill and the Azadi's use of personal funds has depleted reserves that could inject liquidity into its various businesses.

    1.    <u>Implied Covenant of Good Faith and Fair Dealing</u>

In every contract, Maryland recognizes an implied covenant of good faith and fair dealing. *See Food Fair Stores, Inc. v. Blumberg*, 234 Md. 521, 200 A.2d 166, 173-74 (1964).  This does not serve to contradict the contract; however, the duty "prohibits one party to a contract from acting in a manner as to prevent the other party from performing his obligations under the contract."  *See Eastern Shore Markets, Inc. v. A.D. Assoc. Limited Partnership*, 213 F.3d 175, 182-83 (4th Cir. 2000) (citation omitted).  As the Fourth Circuit explained Maryland law, "[U]nder the covenant of good faith and fair dealing, a party impliedly promises to refrain from doing anything that will have the affect of injuring or frustrating the right of the other party to receive the fruits of the contract between them."  *Id*. at 184.

More recently, the Court of Special Appeals of Maryland upheld the use of a jury instruction that read as follows:  "The fact that a party acts in compliance with the literal and technical terms of a contract does not absolve it of liability where it failed to perform in accordance with its duties of good faith and fair dealing."  *CR-RSC Tower, LLC v. RSC Tower I, LLC*, 202 Md. App. 307, 373, 32 A.3d 456, 495 (2011), *cert. granted*, ____ Md. ____, 37 A.3d 319 (2012).  Thus, any response by the Bank that it simply followed the contract does not preclude the Defendants' claim and meritorious defense.

At bar, one thing is certain, Orrstown agreed to fund various projects of the Defendants. Moreover, the Bank gave specific assurances to its borrowers that it would work with them to bring the projects to completion.[8]   The violation of the implied covenant in Orrstown's contractual undertaking to fund the projects, not to mention the subsequent assurances, which themselves should be deemed oral modifications of any contract, frustrated the Defendants' right "to receive the fruits of the contract between [the parties]."  *Eastern Shore* at 184.

Inasmuch as the behavior of Orrstown in frustrating the purpose of the contractual relationship between the parties and thwarting the Defendants' very ability to pay off the loans (by interfering with the consummation of the SBA Loan and the receipt of the tax credit), constitutes a claim against the Bank, it so too constitutes a meritorious defense to the Bank's claim, thereby requiring a vacating or, at minimum, an opening of the confessed judgments.

2.      Misrepresentation Claim

Similarly, the Bank's express statements to the Defendants, and in particular, during the meetings with Miller, constitute intentional misrepresentations that give rise to a claim and, thereby, constitute a meritorious defense requiring a vacating of the confessed judgments.  The elements of intentional misrepresentation are:  (1) the Defendant asserted a false misrepresentation of material fact to the Plaintiff; (2)  the Defendant knew the representation was false or made with such reckless disregard for the truth that the knowledge of its falsity can be imputed to the Defendant; (3) the Defendant made the false misrepresentation for the purpose of defrauding the Plaintiff; (4) the

---

[8] To the extent any governing document states that it can only be modified in writing signed by the parties, Maryland law is clear that oral modifications of the contract are enforceable, notwithstanding such language.  *See* 600 *North Frederick Road, LLC v. Burlington Coat Factory of Maryland, LLC*, 419 Md. 413, 438, 19 A.3d 837, 852 (2010); *Richard F. Kline, Inc. v. Shook Excavating and Hauling, Inc.*, 165 Md. App. 262, 277, 885 A.2d 381, 390; *Mayor and City Council of Baltimore v. Ohio Cas. Ins. Co.*, 50 Md. App. 455, 460, 438 A.2d 933, 936 (1982) (all for the general proposition that oral modifications of a contract are valid despite provision requiring all modifications to be in writing).

Plaintiff relied with justification upon the misrepresentation; and (5) the Plaintiff suffered damages as a direct result of the reliance upon the misrepresentation.  *See Martens Chevrolet, Inc. v. Seny*, 292 Md. 328, 333, 439 A.2d 534, 537 (1982).

In meeting with the Defendants, in July and August of 2011, the Bank asserted that it would work with the Azadis and their Entities to fund the projects, giving assurances that funding would continue to flow.  Inasmuch as the Bank, days, if not hours later, curtailed funding draw requests for approved work and called defaults of the various loans, as indicated in the Complaint Exhibits, the Bank and its representatives had to know at the time the assurances were given that they were false and that they did not intend to cooperate any longer with the Azadis, or their entities and that, indeed, the funding would cease.  The Bank made the false representation clearly for the purpose of getting said Defendants to push as far along as possible on their projects in the hopes of completing it, so as to facilitate the Bank maximizing its position, even at the further risk of its borrowers.  The Azadis and their entities felt comforted by the repeated assurances of Orrstown and its principal representatives and continued its efforts to complete the recreation center on the Bowling Center and the Hamilton Project as well as continued to pursue the funding of the SBA Loan.  When the Bank proverbially pulled the rug out from under the Defendants, the inability to consummate the SBA Loan required the use of personal funds for the business projects even going so far as the Azadis drawing down personal lines of credit with other banks, and losing an opportunity to recover a tax credit for the Hamilton Project in the amount of nearly $800,000.

3.      Misrepresentation by Non-Disclosure

Similarly, Defendants maintain a claim against the Bank, hence have a meritorious defense to the confessed judgments, in the nature of concealment or non-disclosure.  The tort is a

misrepresentation which involves the concealment of material fact with an intent to deceive. *See Finch v. Hughes Aircraft Company*, 57 Md. App. 190, 469 A.2d 867, *cert. denied*, 300 Md. 88, 475 A.2d. 1200 (1984), *cert denied*, 469 U.S. 1215 (1985). Recovery for non-disclosure follows when a defendant has a duty to disclose and fails to disclose a material fact with the intent to deceive and the plaintiff acts in justifiable reliance on the concealment and thereby suffers damages. *See Impala Platinum v. Impala Sales (U.S.A.), Inc.*, 283 Md. 296, 323, 389 A.2d 887, 903 (1978).

By virtue of its contractual undertakings, the Bank had a duty to deal honestly with the Defendants. Moreover, in light of making the expressed representations in the first instance that it would work the Azadis and the Azadi Entities to continue funding the projects, the Bank assumed a duty for itself to make disclosure. The material facts the Bank failed to disclose, in direct contravention of its actual representations, was that it intended to stop funding draw requests, to call defaults on the loans and demand payment. Experienced bankers such as Miller know full well that failing to disclose honestly its intent would assure that the Defendants would continue to move forward on their various projects and expend whatever resources were necessary, rather than abandon the projects, leaving them in a less valuable state for the Bank. As Ash Azadi has affirmed, Defendants did move forward with the various projects based on the expressions of assurance from the Bank and as a result suffered damages, including the expenditure of personal funds, the onset of litigation by Olympic Electric, the apparent loss of the historic tax credit for the Hamilton Project and the inability to obtain, thus far, the SBA Loan that was within reach. The SBA Loan and the tax credit would have allowed the Defendants to curtail the alleged debt by approximately $1.8 million, months ago, but the money has not come to pass because of the Bank's acts and omissions.

## IV.  CONCLUSION

In light of the foregoing facts and points of authority, the Motion to Vacate should be granted.

Respectfully submitted,

/s/ Gary S. Posner
Paul M. Nussbaum (Bar No. 04394)
Gary S. Posner (Bar No. 05863)
Whiteford, Taylor & Preston L.L.P.
Seven Saint Paul Street
Baltimore, Maryland 21202
Telephone:  (410) 347-8700
Facsimile:  (410) 223-4394
Facsimile:  (410) 223-4306
pnussbaum@wtplaw.com
gposner@wtplaw.com

*Counsel for the Defendants*

*1994928*