# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(BALTIMORE)

| | |
|---|---|
| ORRSTOWN BANK | * |
|     Plaintiff, | * |
| v. | * Civil Action No. 1:12-CV-00345-RDB |
| ARES INVESTMENTS GROUP, et al., | * |
|     Defendants. | * |

\*   \*   \*   \*   \*     \*   \*   \*   \*   \*   \*

### AFFIDAVIT OF ASH AZADI

1. I, Ash Azadi ("Ash"), am over eighteen (18) years of age and am competent to testify as to the matters set forth herein.

2. I am a member and a manager of each of the limited liability companies that are defendants in the above-captioned action. Morris Azadi ("Morris") and Simin Azadi ("Simin") are husband and wife. I am their son. In my capacity as a member and a manager of the Entity Defendants, I am familiar with their operations and dealings with Orrstown Bank (alternatively, "Orrstown," the "Bank" or the "Plaintiff"). Further, I have read the Complaint for Judgment by Confession and Breach of Contract and the Motion to Vacate or, in the Alternative to Open Confessed Judgment, along with the Memorandum in Support thereof (the "Memo"). To the extent capitalized terms are not defined in this Affidavit, they have the same meaning attributed to them in the Memo.

3. The Azadis, in an effort to better their well-being and that of their successive generations in the United States, entered into the real estate ownership and development field in about 2005.

4. Ash and Morris are, first and foremost, airline pilots; they are not sophisticated real estate developers.

5. Simin is a housewife.

6. The Azadis, in 2002, first acquired the Maryland Historical Society-registered property known as the Governor Hamilton Hotel, located at 90-98 West Washington Street, Hagerstown, Maryland.[1]

7. Then, Morris and his wife, Simin, acquired two properties, one at 818 Bowman Avenue, which eventually they transferred to Ariston. (A year later, in May 2006, Ariston acquired 830 Bowman Avenue.) In about March 2006, the Azadis, through their entity Ares, purchased South Cleveland Plaza, an office building located at 201 South Cleveland Avenue (the "Cleveland Avenue Property"). Orrstown was a tenant in the Cleveland Avenue Property building at that time.

8. The Azadis also acquired, in 2005, 18-20 West Washington Street and, in 2006, 535 Northern Avenue through Ares.

9. Glad to seize upon an opportunity, Orrstown's Vice President of Commercial Lending, Terry Reiber ("Reiber"), welcomed the Bank's new landlord at the Cleveland Avenue Property and advocated that Ares and the Azadis refinance all of their real estate holdings with Orrstown.

10. Impressed with the seemingly open arms of Orrstown and wooed by Reiber, Ares and the Azadis accepted the invitation to refinance with Orrstown.

11. The Azadis' relationship with Orrstown continued and, in 2009, the Bank financed Aristodemos' acquisition of the land and existing improvements located at 19330 Leitersburg Pike (the "Bowling Alley Property"), destined to be developed into a family entertainment and recreation

---

[1] Unless otherwise noted, all addresses are located in Hagerstown, Maryland.

center, with a bowling alley, an arcade and a bar and restaurant (the "Bowling Center") as well as the development of luxury townhouses by Northwind, in Falling Waters, West Virginia.

12. The Bowling Alley Property also was designed to have attached office space, fronting Oak Hill Avenue.

13. At the time, however, Orrstown refused to finance the operating entity's, Have A Bowl, activities at the Bowling Alley Property, mainly the renovation to create the Bowling Center.

14. In January 2010, the Azadis' fortunes and their entities' took a negative turn. Orrstown abandoned its space in the Cleveland Avenue Property, leaving a gaping hole in Ares' and the Azadi Entities' combined income stream. At or about the same time, Ash Azadi communicated to Orrstown loan officer Brian Selders ("Selders") that the Azadi Entities foresaw financial issues looming due to losses of commercial tenants and an inability to find financing for the recreation center on the Bowling Alley Property.

15. Then, on June 13, 2010, Ash Azadi sent an electronic mail note to Jeffrey Embly, the Bank's CFO ("Embly"), reiterating the Azadi Entities' precarious financial position and the method for resolving the difficulty (the "June 13, 2010 Email"), a true and accurate copy of which appears as Exhibit 2 to the Memo.

16. The June 13, 2010 Email specifically urged a decision from the Bank on whether it would provide funding to complete the Bowling Center and another Azadi Entity project, the renovation of the former Hamilton Hotel into a retail, office and residential condominium complex (the "Hamilton Project"). The Hamilton Project was eligible, and since has qualified, for a tax credit of $767,367, while the outstanding funds needed to complete it was under $600,000.

17. Fortunately, some months later, in January of 2011, the Bank provided additional funding to allow the Azadi Entities to complete the construction of the Bowling Center and extended credit to allow the Hamilton Project to be completed.

18. In June of 2011, the Bank continued to work with the Azadis and their entities, through the Bank's credit team of Selders, Jeff Gayman and Michael Moore.

19. The Bank's credit team provided continuous assurances that it would work with the Azadis and the Azadi Entities and the Bank cultivated a bond of trust and confidence that the Bank would help the Azadis and the Entity Defendants complete their projects. And the Azadis and the Azadi Entities did repose trust and confidence in the Bank.

20. In late July 2011, Selders introduced John Nickey and a new hire of Orrstown, Terry Miller ("Miller"). At that meeting, which Ash Azadi attended, the Defendants reminded the Bank that a Small Business Administration loan in excess of $1.1 Million (the "SBA Loan") was imminent, but that a notice of default from the Bank would jeopardize the loan. During this meeting, Miller specifically reassured the Azadis and, through them, their entities, that the Bank would allow them time to stabilize their projects and finances and the Bank would honor its commitment to fund the draw requests for the completion of the Bowling Center. At the time, there was approximately $800,000 in available funds under the credit facility for the Bowling Center project.

21. Accordingly, the Azadi Entities continued to pursue the construction of their projects, most notably the Bowling Center, committing to pay contractors on the jobsites and incurring the obligations related thereto.

22. The Bank's consulting architect reviewed and approved the work performed at the Bowling Alley Property.

23. In August 2011, the Azadis met, again, with Miller, and provided construction draw requests for payment of subcontractors on the Bowling Center (for which an occupancy permit issued on August 24, 2011).

24. Despite assurances from Miller that Orrstown would work with the Azadis and the Azadi Entities, however, without advance notice, and just days before the scheduled opening of the Bowling Center, Miller only authorized a portion of the draw requests to pay subcontractors and declined to fund draw requests, despite the approval by the Bank's architectural consultant.

25. Specifically, despite available funds under the credit facility with Orrstown, the Bank only funded, in round numbers, $65,000 owed to Brunswick Bowling Centers, $14,000 to the company that installed the arcade game machine card system and $41,500 to the roofer whose invoice was not due, in full, for six months.

26. Orrstown declined to fund the electrician, Olympic Electric, the HVAC contractor or the invoice for the flooring subcontractor. Flooring for the Bowling Center was ordered through the Azadis' Catania entity so as to take advantage of its ability to purchase materials at a favorable wholesale cost. A wholly independent installation subcontractor installed the flooring, but remains unpaid because Orrstown refused to fund the draw request. Thus, the Azadis were forced to choose between paying the subcontractors, for whom draw requests were denied, from personal funds, to the extent available, or risk the unpaid subcontractors walking off the job, refusing to honor warranties or filing suit. The Bank prohibited the Azadi Entities from paying in excess of $130,000 for work actually performed at the Bowling Center.

27. Morris Azadi paid approximately $30,000 from his personal funds or funds drawn from personal lines of credit at other banks. Likewise, the Defendants used another $50,000 of personal funds to cover the opening expenses for the Bowling Center.

5

28. Many of those subcontractors the Azadis could not pay did walk-off the job and some have refused to honor warranties applicable to their work.

29. Olympia Electric has gone the extra step, suing Aristodemos and Ash Azadi, personally.

30. Consequently, the Defendants' businesses, personal fortunes and business reputations have been damaged and diminished.

31. Only one week after Miller gave specific assurances that the Bank would work with its borrowers to allow for the projects to stabilize, Miller pulled the proverbial rug out from under them and, on August 26, 2012 issued default notices to the Azadi Entities and the Azadis.

32. The default notices immediately jeopardized the SBA Loan for over $1.1 Million that the Azadis had secured for the Bowling Center and substantially would have reduced the Defendants' alleged debt to the Bank.

33. The Azadis made full disclosure to the Bank about the SBA Loan and the Bank knew that its action jeopardized the SBA Loan, but Miller and the Bank did not care.

34. Instead, Orrstown refused to fund any more project work, including the Bowling Center that stood on the precipice of opening and generating revenue in a few weeks and the Hamilton Project that would generate over $170,000 of net revenue from the historic tax credit, that was going to be paid over to the Bank.

35. But for Orrstown's precipitous actions, the Azadi Entities, would have been able to pay, approximately, $1.8 Million to the Bank, which would have been realized from the SBA Loan and the gross amount of the tax credit on the Hamilton Project.

36. Instead, the Azadis are indebted to contractors, they have had to pay personal funds, have not yet received the proceeds of the SBA Loan or the historic tax credit and have had to shut down the Hamilton Project.

37. Contrary to its undertaking, promises and assurances to work with the Azadis and their entities, the Bank has declined to fund the projects, thereby frustrating the essence of the deals negotiated with the Bank.

I HEREBY AFFIRM UNDER THE PENALTIES OF PERJURY THAT THE CONTENTS OF THE FOREGOING PAPER ARE TRUE.

Date: April 9, 2012

_____
Ash Azadi

1996894