IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(NORTHERN DIVISION)

| | | |
|---|---|---|
| ORRSTOWN BANK, | * | |
| | * | |
| Plaintiff/Counter-Defendant, | * | |
| | * | Civil No. 1:12-cv-00345 RDB |
| v. | * | |
| | * | |
| ARES INVESTMENT GROUP, LLC, <u>et al.</u>, | * | **HEARING REQUESTED** |
| | * | |
| Defendants/Counter-Plaintiffs. | * | |

**MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO DISMISS COUNTERCLAIM**

## TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................1

MATERIAL ALLEGATIONS .................................................................................2

I.      Defendants and their real estate development projects....................................2

II.     Defendants experience financial problems beginning in January 2010
        and request additional credit from Orrstown .................................................3

III.    Orrstown places Defendants in default...........................................................4

STANDARD OF REVIEW .....................................................................................5

ARGUMENT...........................................................................................................6

I.      Defendants released their alleged counterclaims in credit
        agreements executed in 2011 ..........................................................................6

II.     Defendants have failed to state a claim for breach of contract,
        or breach of the implied covenant of good faith and
        fair dealing (Count I) ......................................................................................8

        A.  Defendants have failed to state a claim for breach of an
            express oral contract .................................................................................9

        B.  Defendants have failed to state a claim for breach of the
            implied covenant of good faith and fair dealing .....................................13

III.    Defendants have failed to state a claim for intentional misrepresentation
        (Count II) .......................................................................................................16

IV.     Defendants have failed to state a claim for non-disclosure (Count III)........23

V.      Defendants do not allege that they have been harmed...................................27

CONCLUSION.......................................................................................................29

Plaintiff Orrstown Bank ("Orrstown"), through its undersigned counsel, submits this memorandum of law in support of its motion to dismiss Defendants' Counterclaim. (ECF No. 24).

## Introduction

> In these difficult economic times with
> falling real estate prices, lender liability suits
> have become one of the few growth industries.[1]

Defendants have defaulted on over $16 million in commercial loans and lines of credit extended to them by Orrstown. Defendants borrowed those funds from Orrstown in order to pursue their numerous real estate development projects in and around Hagerstown, Maryland. Orrstown filed this lawsuit for confession of judgment and breach of contract after Defendants defaulted on their payment obligations.

Defendants' response to the lawsuit was predictable. They moved to vacate the confessed judgments (ECF No. 23) and filed a Counterclaim against Orrstown (ECF No. 24), essentially alleging that Orrstown should be held liable for declaring a default and enforcing its rights under the loan documents. Notably, Defendants do not contest that: (a) they received substantial funding from Orrstown; (b) they voluntarily and knowingly executed the loan documents attached to Orrstown's First Amended Complaint (ECF No. 26); (c) they were in material default of their payment obligations under those documents at all relevant times; and (d) Orrstown was entitled under those documents to declare a default, demand payment, accelerate the balance owed, and file this action to seek recovery.

Defendants nonetheless attempt to allege three counterclaims against Orrstown: "breach of contract including implied covenant of good faith and fair dealing" (Count I); "intentional

---

[1] Parker v. Columbia Bank, 91 Md. App. 346, 351 (1992), cert. denied, 327 Md. 524 (1992). Internal citations and quotations are omitted from this memorandum unless otherwise noted.

misrepresentation" (Count II); and "non-disclosure" (Count III).  Defendants allege that

Orrstown orally agreed to "work with" them to help complete two of their real estate projects,

but that Orrstown thereafter declined to extend further funds for those projects and declared a

default.

       These allegations fail to state any claim upon which relief can be granted.  The

Counterclaim should be dismissed with prejudice.

**Material Allegations**

**I.      Defendants and their real estate development projects.[2]**

       Defendants Morris and Ash Azadi (father and son) are airline pilots and managing

members of Defendants Ares Investment Group, LLC, Aristaeus, LLC, Aristodemos Capital

Group, LLC, Ariston Real Estate Group, LLC, Catania USA, LLC, Have A Bowl, LLC,

Northwind Townhomes, LLC, Polar, LLC, and UGO, LLC.  (Counterclaim at ¶¶ 2, 9).

Defendant Simin Azadi is Morris Azadi's wife.  (Id. at ¶ 2).

       Beginning in 2005, Morris, Simin, and Ash Azadi (individually and through the various

entity Defendants) began pursuing real estate development opportunities in order to "better their

well-being."  (Counterclaim at ¶ 5).  Defendants have purchased and sought to develop at least

seven (7) properties around Hagerstown, including an historic hotel, an office building,

townhouses, and "a family entertainment and recreation center, with a bowling alley, an arcade

---

[2] The well-pled factual allegations of the Counterclaim are assumed to be true for purposes of
this memorandum, only.

2

and a bar and restaurant." (Id. at ¶¶ 8-13). Defendants financed their projects through credit provided by Orrstown.[3] (Id. at ¶¶ 11, 13, 17, 19).

## II.     Defendants experience financial problems beginning in January 2010 and request additional credit from Orrstown.

Defendants allege that their real estate fortunes declined in January 2010. (Counterclaim at ¶ 16). In June 2010, Defendants requested that Orrstown either provide additional financing to complete two projects (the hotel and bowling alley) or provide relief by reducing the interest rates on Defendants' loans. (Id. at ¶¶ 17-18). An email from Ash Azadi to Orrstown at the time stated that Defendants were "desperately running out of time," and that "time is of the essence." (Counterclaim, Exhibit 1 at p. 1). Ash Azadi requested immediate funds for the bowling alley, or an interest rate reduction for "all existing loans to 3% fixed for 3 years with interest only payments," plus $590,000 in additional funds to complete the hotel project. (Id.). Ash Azadi stated, "[w]e are doing everything we can on our part to reduce our debt with Orrstown . . . [a]s always, my father and I always appreciate your willingness to listen and work with us, and hope that we can reach an amicable solution." (Id.).

In January 2011, Orrstown agreed to extend certain additional financing for the bowling alley and hotel. (Counterclaim at ¶ 19). Defendants allege that Orrstown "continued to work with" Defendants in June 2011. (Counterclaim at ¶ 20). There is no allegation explaining what Orrstown Bank did (or did not do) in allegedly working with Defendants at this time, nor is there any allegation specifying the terms of the additional financing allegedly extended by Orrstown in January 2011.

---

[3] Defendants do not allege the terms of the financing they received from Orrstown, nor attach the written credit agreements to the Counterclaim. They do not, however, dispute that the credit agreements attached to Orrstown's First Amended Complaint are the applicable agreements.

The Counterclaim also alleges that Orrstown gave "continuous assurances that it would work with" Defendants and "help . . . complete their projects." (Counterclaim at ¶ 21). There is no allegation specifying the content or nature of those alleged assurances, or identifying the person who gave them, or when, or where.

**III.    Orrstown places Defendants in default.**

According to Defendants, during a meeting at which the topic of their default was discussed, an Orrstown official orally represented that the bank "would allow them time to stabilize their projects and finances and the Bank would honor its commitment to fund the draw requests for the completion of the Bowling Center." (Counterclaim at ¶ 22). Defendants allege that at that time there was approximately $800,000 in available funds to be used for construction draws for the bowling alley. (Id.). The Counterclaim is unclear as to whether this meeting occurred in July or August 2011. (Id. at ¶¶ 22, 33, 54).

In August 2011, "just days before" the bowling alley was scheduled to open, Defendants allegedly presented Orrstown with a series of construction draw requests. (Counterclaim at ¶¶ 25-28). Orrstown agreed to fund $120,500 at that time, but declined to fund another $130,000. (Id. at ¶¶ 27-28). No allegations are made with respect to Orrstown's reason(s) for funding some draw requests but not others. Similarly, there is no allegation that Orrstown was required under any of the applicable credit agreements to provide full funding for these requests, nor any allegation that Orrstown breached the terms of any credit agreement by declining to fully fund the requests.

Orrstown issued formal default notices to Defendants on August 26, 2011.[4] (Counterclaim at ¶ 33). Defendants allege that these notices were issued one week after

---

[4] The Counterclaim erroneously alleges the date to be August 26, 2012.

4

Orrstown supposedly stated that it would work with Defendants "to allow for the projects to stabilize." (Id.). There is no allegation anywhere in the Counterclaim that Defendants were not in material default of their payment obligations as of August 26, 2011, when the default notices were issued, or at present.

Defendants allege that Orrstown's placement of their loans into default status prevented them from obtaining a Small Business Administration loan for over $1.1 million, which they allegedly would have paid to Orrstown to help reduce their loan debt. (Counterclaim at ¶¶ 22, 34). Defendants also allege that Orrstown's decision not to provide an additional $600,000 to fund the hotel project prevented them from completing the project and obtaining a tax credit of $767,367. (Id. at ¶¶ 18, 36). Defendants allege that they would have paid the nearly $170,000 of net revenue from the tax credit to Orrstown. (Id. at ¶ 36).

Defendants make no allegation that Orrstown was required under any of the applicable credit agreements to provide the additional $600,000 of funding for the hotel. Nor do they allege that Orrstown breached the terms of any credit agreement by declining to provide those funds (nor, for that matter, any allegation that there was $600,000 in available funds for the hotel project).

## Standard of Review

To survive a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), a claimant must plead factual allegations sufficient to "raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1965 (2007). In other words, there must be sufficient facts alleged to give rise to a facially plausible claim, not merely a possible claim. Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

5

draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. As

this Court recently held, "a court must draw on its judicial experience and common sense to

determine whether the pleader has stated a plausible claim for relief." Atlantic Forest Products

LLC v. Wm. M. Young Co. LLC, 2011 WL 6351851 at *2 (D. Md. Dec. 19, 2011).  In making

that determination, the Court "need not accept the legal conclusions drawn from the facts, and . .

. need not accept as true unwarranted inferences, unreasonable conclusions or arguments." Id.

**Argument**

Defendants have failed to state any claim upon which relief can be granted.  Their

purported counterclaims for "breach of contract including implied covenant of good faith and

fair dealing" (Count I), "intentional misrepresentation" (Count II), and "non-disclosure" (Count

III), should be dismissed.

**I.      Defendants released their alleged counterclaims in credit agreements executed in
2011.**

Defendants' counterclaims should be dismissed because they previously released those

claims.  Orrstown attached the numerous credit agreements at issue in this litigation to its First

Amended Complaint.  (See ECF No. 26).  In at least three of those agreements, Defendants

(except UGO) released their present counterclaims.

•       In a Modification and Assumption Agreement dated January 12, 2011,

Defendants Morris, Simin, and Ash Azadi, along with Ares Investment Group, Aristodemos

Capital Group, Aristaeus, Ariston Real Estate Group, Polar, and Northwind Townhomes agreed

as follows:

> Release.  Debtors release, acquit and forever discharge Lender and Lender's
> subsidiaries, affiliates, officers, directors, agents, employees, servants, attorneys
> and representatives from any and all claims, demands, debts, actions, causes of
> action, suits, contracts, agreements, obligations, accounts, defenses, offsets

6

against the Loan and <u>liabilities of any kind or character whatsoever, known or unknown, which any of Debtors ever had, has or might have hereafter.</u>

(First Amended Complaint, Exhibits 2A & 2I; ECF No. 26-14 at p. 17 of 22; ECF No. 26-22 at

p. 6 of 19) (emphasis added).

- In another Modification and Assumption Agreement dated January 12, 2011,

Defendants Morris and Ash Azadi, along with Ares Investment Group, Aristodemos Capital

Group, Aristaeus, Ariston Real Estate Group, Polar, Catania USA, and Northwind Townhomes

agreed as follows:

> <u>Release</u>. Debtors <u>release, acquit and forever discharge</u> Lender and Lender's subsidiaries, affiliates, officers, directors, agents, employees, servants, attorneys and representatives from <u>any and all claims</u>, demands, debts, actions, causes of action, suits, contracts, agreements, obligations, accounts, defenses, offsets against the Loan and <u>liabilities of any kind or character whatsoever, known or unknown, which any of Debtors ever had, has or might have hereafter.</u>

(First Amended Complaint, Exhibit 2G; ECF No. 26-20 at p. 30 of 62) (emphasis added).[5]

- In another Modification and Assumption Agreement dated June 17, 2011,

Defendants Morris, Simin, and Ash Azadi, along with Ares Investment Group, Aristodemos

Capital Group, Aristaeus, Ariston Real Estate Group, Polar, Catania USA, Have a Bowl, and

Northwind Townhomes agreed as follows:

> <u>Release</u>. Debtors <u>release, acquit and forever discharge</u> Lender and Lender's subsidiaries, affiliates, officers, directors, agents, employees, servants, attorneys and representatives from <u>any and all claims</u>, demands, debts, actions, causes of action, suits, contracts, agreements, obligations, accounts, defenses, offsets against the Loan and/or the other Credit Accommodations and <u>liabilities of any kind or character whatsoever, known or unknown, which any of Debtors ever had, has or might have hereafter.</u>

(First Amended Complaint, Exhibit 2G; ECF No. 26-20 at p. 41 of 62) (emphasis added).

---

[5] Defendants allege in their motion to vacate (ECF No. 23 at pp. 17-18) that this agreement was not supported by consideration. That argument is meritless, as established in Orrstown's contemporaneously-filed opposition to that motion.

Defendants do <u>not</u> challenge the authenticity of these documents or dispute their voluntary and knowing execution of them in their motion to vacate (ECF No. 23) or in their First Amended Answer (ECF No. 33).[6]  This Court may consider these agreements in the context of Orrstown's motion to dismiss because they are integral to the counterclaims and their authenticity is not challenged.[7]  <u>Philips v. Pitt County Mem. Hosp.</u>, 572 F.3d 176, 180 (4th Cir. 2009); <u>Blankenship v. Manchin</u>, 471 F.3d 523, 526 fn. 1 (4th Cir. 2006).

Accordingly, having fully released all claims -- "of any kind or character whatsoever" -- that they ever had or might in the future have against Orrstown, Defendants (except UGO) may not now pursue their counterclaims.

## II.    Defendants have failed to state a claim for breach of contract, or breach of the implied covenant of good faith and fair dealing (Count I).

Count I, like the remainder of the Counterclaim, is far from a model of clarity.  It appears that Defendants attempt to allege that: (a) Orrstown breached an express oral agreement to "work with" them and fund draw requests for the bowling alley and hotel when it subsequently halted funding and declared a default; and (b) Orrstown breached the implied covenant of good faith and fair dealing when it halted funding and declared a default.  (Counterclaim at ¶¶ 40-50).

### A.    Defendants have failed to state a claim for breach of an express oral contract.

Defendants do <u>not</u> allege that Orrstown breached any provision of any written credit agreement.  They do <u>not</u> allege that any written credit agreement prohibited Orrstown from

---

[6] <u>See</u>, <u>e.g.</u>, First Amended Answer at ¶¶ 45, 60, 77, 159, and 173.

[7] At a minimum, these documents are integral to Defendants' alleged claim for "breach of contract including implied covenant of good faith and fair dealing" (Count I), because any claim that Orrstown breached the implied covenant necessarily depends upon the existence and terms of the parties' express credit agreement(s), which these agreements memorialize in part. Defendants also reference the various credit agreements between themselves and Orrstown in ¶ 41 of the Counterclaim.

8

ceasing to fund Defendants' projects and declaring a default, nor do they attempt to allege that they were in compliance with their payment obligations at the time Orrstown declared a default.

Defendants' breach-of-contract claim is based entirely on an allegation that Orrstown breached an alleged oral agreement to "work with" them and "to cover the draw requests" for their bowling alley and hotel projects. (Counterclaim at ¶ 43). This alleged claim fails under Maryland law.[8]

Preliminarily, the Counterclaim is ambiguous as to the nature of the alleged oral agreement that forms the basis of Count I. For example, in ¶ 22, Defendants allege that Orrstown "reassured the Azadis and, through them, their entities, that the Bank would allow them time to stabilize their projects and finances and the Bank would honor its commitment to fund the draw requests for the completion of the Bowling Center," without reference to the hotel. In ¶ 43, however, Defendants allege that Orrstown "expressly agreed to work with them and to cover the draw requests" for the bowling alley and hotel. And, in ¶ 21, Defendants allude to other alleged "assurances" that Orrstown would "work with" and "help" them.[9]

The ambiguity concerning what would be funded, how Orrstown would "work with" Defendants, and what would be permitted to "stabilize" warrants dismissal. Polek v. J.P. Morgan Chase Bank, N.A., 424 Md. 333, 362 (2012) (to plead a claim for breach of contract, a plaintiff must "allege with certainty and definiteness facts showing a contractual obligation owed by the defendant to the plaintiff"); Robinson v. GEO Licensing Co., L.L.C., 173 F. Supp.2d 419,

---

[8] Defendants' motion to vacate is premised on Maryland law. (ECF No. 23). Orrstown agrees that Maryland law is the controlling substantive law in this action.

[9] Defendants do not allege when these supposed assurances were given, who gave them, who received them, or what the assurances included. MedImmune, Inc. v. Centocor, Inc., 271 F. Supp.2d 762, 771 (D. Md. 2003) ("vague and conclusory allegations are insufficient to satisfy the notice pleading requirements of the Federal Rules of Civil Procedure").

423 (D. Md. 2001) (same). The Counterclaim is anything but certain and definite in its characterization of the nature of the oral agreement allegedly made by Orrstown.[10]

Regardless of the nature or timing of the alleged oral agreement, the fact that it was an oral agreement means that Defendants' claim is barred by the Maryland Credit Agreement Act (Md. Code Ann., Cts. & Jud. Proc. § 5-408) (the "Act").[11] The Act broadly defines a "credit agreement" as, inter alia, an agreement by a bank to lend money, extend credit, forebear from "exercising any right to collect a debt," or "to take or to not take certain actions . . . in connection with an existing or prospective credit agreement." §§ 5-408(a)(2)(i), (ii). Under the Act, any such "credit agreement" is "not enforceable by way of action or defense," unless the agreement:

(1) Is in writing;
(2) Expresses consideration;
(3) Sets forth the relevant terms and conditions of the agreement; and
(4) Is signed by the person against whom its enforcement is sought.

§ 5-408(b) (emphasis added).

Here, there is no allegation in the Counterclaim that the purported statement(s) by Orrstown to the effect that it would "work with" Defendants and fund draw requests related to the bowling alley and/or hotel was made in a writing signed by an authorized Orrstown representative. (See Counterclaim at ¶¶ 22, 43-44). Nor is there any allegation of a similar agreement located in any of the parties' written credit agreements. Because Orrstown's alleged oral agreement to "work with" Defendants and fund draw requests is a purported agreement to lend money (or "to take or to not take certain actions . . . in connection with an existing or

---

[10] The Counterclaim is also ambiguous as to when Orrstown allegedly made this oral agreement. For example, ¶ 22 alleges that it was made during a July 2011 meeting; ¶ 33 alleges that it was made in August 2011, or just days before the August 26, 2011, default notices were issued; ¶ 44, meanwhile, alleges that the agreement is based on "statements in the Summer of 2011"; and no date is accredited to the alleged "assurances" referenced in ¶ 21.

[11] There is no indication in the Counterclaim that any of the credit extended by Orrstown to Defendants was primarily for personal, family, or household purposes. § 5-408(c)(2)(i).

prospective credit agreement"), the Act is applicable here.  It follows that because there is <u>no</u>
<u>allegation</u> that this supposed agreement was made in writing, it is "not enforceable by way of
action or defense" under the Act.  § 5-408(b).

This Court has repeatedly applied the Act to preclude a plaintiff from seeking recovery
based on alleged oral credit agreements.  In <u>Howard Oaks, Inc. v. Maryland Nat'l Bank</u>, 810 F.
Supp. 674, 676-77 (D. Md. 1993), Judge Smalkin dismissed claims similar to those made here.
In <u>Howard Oaks</u>, the plaintiff alleged that the defendant bank made an oral agreement to
continue funding a commercial development project, and that the bank breached that agreement
when it placed the plaintiff in default and pursued a confessed judgment action.  Judge Smalkin
squarely rejected the plaintiff's claim:

> [Plaintiff] contends that there were assurances, oral and written, beyond the face
> of the loan documents, that bound [the defendant] to continue to fund [the
> project].  <u>Lender malpractice suits based on such side agreements are precisely</u>
> <u>the sort of mischief that the Maryland legislature intended to curtail by enactment</u>
> <u>of [the Act], which clearly bars the claim attempted to be asserted in Count One.</u>

<u>Id.</u> at 676-77 (emphasis added).  The very same rationale applies to, and disposes of, Defendants'
breach-of-contract claim.

In <u>Dupont Heights Ltd. P'Ship v. Riggs Nat'l Bank of Washington, D.C.</u>, 949 F. Supp.
383, 388-89 (D. Md. 1996), Judge Messitte granted summary judgment against a commercial
real estate developer complaining (as Defendants complain here) that the defendant bank failed
to fully fund the construction draws and development costs.  The plaintiff argued, among other
things, that the bank did not timely pay draw requests, based on an alleged oral agreement by the
bank that such requests would be paid within a week.  <u>Id.</u> at 388.  Judge Messitte rejected this as
a viable basis of recovery: "Since 1989 . . . Maryland statutory law has provided [under the Act]

11

that a commercial loan agreement will be unenforceable unless in writing and that an oral modification will not suffice." Id.

In Kuechler v. Peoples Bank, 602 F. Supp.2d 625 (D. Md. 2009), Judge Motz granted summary judgment against plaintiffs who had executed a personal guaranty, secured by a mortgage on their residence, in connection with a commercial loan extended to their son. Id. at 627-28. The plaintiffs alleged that the bank provided them with oral assurances that, in the event of a default by their son, it would foreclose first on the son's commercial property. Id. When the bank later demanded full payment of the loan from the plaintiffs without first foreclosing on the son's commercial property, the plaintiffs sued based on the bank's alleged oral representations. Id. at 628, 631.

Finding that the written credit agreement did not contain any mention of the alleged oral agreement, Judge Motz rejected the plaintiffs' claims: "The terms of the written [credit] agreement are unambiguous and, under [the Act], may not be modified by oral representations or promises." Id. at 632.

In Pease v. Wachovia SBA Lending, Inc., 416 Md. 211, 226-27 (2010), the Court of Appeals of Maryland clarified that the Act does not bar defendants from relying on an oral representation in order to assert certain tort counterclaims as a set-off to a "concededly enforceable credit agreement." "On the other hand," the Court of Appeals held, "the legislative history of the Act is clear that, if the [defendants] were asserting the counterclaims as a means to defeat directly or attain a modification of the credit agreement with [the bank], the Maryland Credit Agreement Act would be triggered and bar consideration of the underlying allegations . . .." Id. The Act applies whenever a plaintiff, through a claim or defense, "attempts to recover on

12

a verbal promise to lend/borrow, or seeks to enforce a verbal modification of an existing credit agreement."[12] Id. at 225 (emphasis added).

In Count I, Defendants are seeking direct, affirmative relief for breach of contract based on an alleged oral statement made by Orrstown that it would "work with" them and fund draw requests related to the bowling alley and hotel. Thus, Defendants are seeking to enforce and recover upon an alleged oral agreement, or are seeking to modify the written credit agreements with an alleged oral agreement. This Court has repeatedly rejected similar claims, and the Court of Appeals of Maryland has also rejected it.

## B.    Defendants have failed to state a claim for breach of the implied covenant of good faith and fair dealing.

Defendants further allege, apparently, that Orrstown breached the implied covenant of good faith and fair dealing by ceasing to fund the bowling alley and hotel projects and declaring a default, after having allegedly orally agreed to "work with" Defendants and fund their draw requests. Defendants aver that by doing so, Orrstown "frustrated . . . the funding and the successful completion of [Defendants'] projects and the repayment of any indebtedness to the Bank." (Counterclaim at ¶ 50). This claim also fails under Maryland law.

First, this claim is precluded by the Act. Just as Defendants cannot directly enforce Orrstown's alleged oral agreement to "work with" them through an express breach-of-contract action, they logically cannot use that same alleged oral agreement as the basis for asserting a breach of the implied covenant of good faith and fair dealing. Otherwise, Defendants could make an end-run around the essential purpose of the Act, which is to "protect lenders against

---

[12] The Court of Appeals cited this Court's opinion in Kuechler with approval, explaining that "the Plaintiffs' claim in Kuechler was essentially that the bank's inducements and assurances effectuated a modification of the original credit agreement. Of course, the legislative history of the Maryland Credit Agreement Act is clear that such alleged modifications are unenforceable unless in writing." Id. at 877 fn. 10.

claims that the lender made a verbal promise to loan money and then refused to do so." <u>Pease,</u>
416 Md. at 224-25. That purpose can only be served if a lender is protected from allegations,
like those here, that it breached the implied covenant of good faith and fair dealing based on an
alleged oral credit agreement.[13]

Courts routinely hold that a claim based on the implied covenant of good faith and fair
dealing cannot be maintained when the underlying express contract is unenforceable, including
when that contract is unenforceable based upon a statute of frauds like the Act. <u>See, e.g., Dalton</u>
<u>v. Countrywide Home Loans, Inc.,</u> ___ F. Supp.2d ___, 2011 WL 6012508 at *6-7 (D. Colo.
Dec. 1, 2011) (mortgagor's claim against lender for breach of the implied covenant was
precluded by Colorado's credit agreement statute of frauds, to the extent the claim was based on
the lender's alleged oral agreements); <u>Thiam v. Am. Talent Agency, Inc.,</u> 2012 WL 1034901 at
*6 (S.D.N.Y. Mar. 27, 2012) ("when an oral agreement is unenforceable, there can be no breach
of the implied covenant of good faith and fair dealing"); <u>Dubton House, Inc. v. St. Marys Paper,</u>
<u>Ltd.,</u> 111 F. Supp.2d 115, 118 (D. Conn. 1999) (because the underlying contract was
unenforceable under the applicable statute of frauds, a claim for breach of the implied covenant
could not be maintained); <u>Schering-Plough Healthcare Products, Inc. v. NBD Bank, N.A.,</u> 890 F.
Supp. 651, 658-59 (E.D. Mich. 1995), <u>aff'd,</u> 98 F.3d 904 (6th Cir. 1996) (claim for breach of the
implied covenant was barred because, <u>inter alia,</u> the underlying contract was barred by the
applicable statute of frauds); <u>McClure v. Duggan,</u> 674 F. Supp. 211, 225 (N.D. Tex. 1987) (claim

---

[13] To the extent Defendants contend that they have an independent cause of action based on a
breach of the implied covenant, that contention would be foreclosed by settled Maryland law.
<u>See, e.g., Magnetti v. University of Maryland,</u> 171 Md. App. 279, 285 fn. 3 (2006), <u>aff'd,</u> 402
Md. 548 (2007) ("Maryland does not recognize a separate cause of action for breach of the
implied covenant of good faith and fair dealing; the allegations making up such a claim should
be pursued under a . . . breach of contract claim"); <u>Barry v. EMC Mortgage,</u> 2011 WL 2669436
at *6-7 (D. Md. Jul. 6, 2011) (dismissing claim for breach of the implied covenant because there
is no such independent cause of action under Maryland law) (citing numerous cases).

for breach of the implied covenant cannot be maintained where the underlying contract is unenforceable under a statute of frauds).[14]

Second, even if Defendants could assert a breach of the implied covenant based on an unenforceable oral agreement (they cannot), Count I would still fail to allege facts showing a breach of that covenant. Under Maryland law, the implied covenant is narrowly construed to prohibit "one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract." Mount Vernon Props., LLC v. Branch Banking & Trust Co., 170 Md. App. 457, 472 (2006), cert. denied, 397 Md. 397 (2007). Stated in slightly different terms by the Fourth Circuit,

> the covenant [of good faith and fair dealing under Maryland law] is limited to prohibiting one party from acting in such a manner as to prevent the other party from performing his obligations under the contract. The covenant does not extend to imply a general duty of good faith and fair dealing in the performance of obligations under the contract that do not implicate or impair another party's performance under the contract.

Edell & Associates, P.C. v. Law Offices of Peter G. Angelos, 264 F.3d 424, 444 (4th Cir. 2001) (emphasis in original), citing Eastern Shore Markets, Inc. v. J.D. Associates Ltd. P'ship, 213 F.3d 175, 182-83 (4th Cir. 2000).

Defendants make no allegation that Orrstown did anything to prevent them from performing their obligations under any credit agreement -- i.e., there are no facts alleging that Orrstown prevented Defendants from repaying their debts. Instead, Defendants allege that they were deprived of receiving certain alleged benefits as a result of Orrstown's decision to cease funding and declare a default, namely, the completion of their bowling alley and hotel and the

---

[14] To the extent, contrary to their allegations, Defendants would argue that their purported claim under the implied covenant is based on the express provisions of the written credit agreements (or any of them), then the claim would still fail for the simple reason that Defendants have failed to allege any of those express terms.

receipt of a tax credit and Small Business Administration loan. (Counterclaim at ¶ 49). This does not state a claim for relief under Maryland law.

Defendants appear to allege that Orrstown "frustrated" their ability to repay the loans by ceasing to fund construction of their projects and declaring a default. (Counterclaim at ¶ 50). Whether Defendants' ability to meet their debt-service obligations under the Orrstown loans were "frustrated" or made more difficult by Orrstown's decision to declare a default is irrelevant under the law. To allege a breach of the implied covenant of good faith and fair dealing, Defendants must aver that they were "prevented" from paying. There is no allegation in the Counterclaim that Orrstown, or anybody else, prevented Defendants from satisfying their loan obligations. Nothing restricts the sources of funds from which those obligations could be met. Further, given that Defendants do not dispute that they were in default well <u>before</u> Orrstown halted funding and declared a default, it is clear that their ability to meet their payment obligations was "frustrated" by something or someone entirely unrelated to Orrstown.

Moreover, under such a theory, <u>every</u> bank would be subject to a claim for breach of the implied covenant in <u>every</u> instance where it stopped funding a development, even where (as here) there is no allegation that the bank breached the credit agreements by stopping funding <u>and</u> no allegation that the borrowers were in good standing. This would, in effect, impose a duty of continued funding on a bank that otherwise would not exist under the documents. The law does not permit the implied covenant of good faith and fair dealing to be misused in this manner. <u>See, e.g.</u>, <u>Parker</u>, 91 Md. App. at 366 ("the duty of good faith . . . does not obligate a lender to take affirmative actions that the lender is clearly not required to take under its loan documents"); <u>Eaglehead Corp. v. Cambridge Capital Group, Inc.</u>, 170 F. Supp.2d 552, 562 (D. Md. 2001) (the "implied duty cannot override or modify specific contractual terms"). <u>See also</u> <u>Waller v.</u>

Maryland Nat'l Bank, 95 Md. App. 197, 212-13 (1993), vacated on other grounds, 332 Md. 375

(1993) (holding that a bank does not, under the implied covenant of good faith and fair dealing,

owe a duty to demand payment of a demand note before initiating collection activities, because

"the implied duty of good faith does not change the terms of the contract").

Defendants make no allegation that the enforceable, written credit agreements restricted

Orrstown from ceasing funding of the bowling alley and hotel and declaring a default when it

allegedly did. The implied covenant of good faith and fair dealing cannot be used to add such a

restriction. Count I should be dismissed.

**III.    Defendants have failed to state a claim for intentional misrepresentation (Count II).**

In Count II, Defendants assert a claim for "intentional misrepresentation," or fraud.[15]

This claim is also based on Orrstown's alleged oral representation that it would "work with"

Defendants and fund their bowling alley and/or hotel projects (Counterclaim at ¶¶ 52-53), which

Defendants allege was false when made (id. at ¶ 54).

Under Maryland law, a fraud claim requires allegations of the following:

1.    A false representation by the defendant;

2.    The defendant either knew the statement was false or made the statement
      with reckless indifference to the truth;

3.    The statement was made for the purpose of defrauding the plaintiff;

4.    The plaintiff relied on the statement and had a right to rely on the
      statement; and

5.    The plaintiff suffered compensable, actual damages as a result of relying
      on the statement.

---

[15] Intentional misrepresentation and fraud are simply two names for the same tort. See Cent. Truck Ctr., Inc. v. Cent. GMC, Inc., 194 Md. App. 375, 388 (2010); Brass Metal Prods., Inc. v. E-J Enterprises, Inc., 189 Md. App. 310, 353 (2009).

Cent. Truck at 388; Brass Metal at 353.  Under Fed. R. Civ. P. 9(b), a party alleging fraud must

plead the relevant facts and circumstances with particularity.  "To satisfy this standard, plaintiffs

must, at a minimum, describe the time, place, and contents of the false representations, as well as

the identity of the person making the misrepresentation and what he obtained thereby."  My Nat'l

Tax & Ins. Servs., Inc. v. H&R Block Tax Servs., Inc., ___ F. Supp.2d ___, 2012 WL 89821 at

*2 (D. Md. Jan. 11, 2012).  Particularized allegations of fact are also required to show how the

party "came to rely" on the alleged misrepresentations.  Hill v. Brush Engineered Materials, Inc.,

383 F. Supp.2d 814, 823 (D. Md. 2005).

Defendants have utterly failed to meet this heightened pleading standard.[16]  Count II does

not specify the precise representation(s) upon which it is based, thus requiring Orrstown to sift

through the other allegations of the Counterclaim in an attempt to determine the basis of the

claim.  But those other allegations are far from clear, precise, or particularized, as required by

Fed. R. Civ. P. 9(b).

- Defendants have failed to specify the time, number, place, and contents of the

alleged false representation(s).  With respect to the time of the alleged representation(s),

Defendants allege in ¶ 22 that a representation occurred sometime in July 2011; in ¶ 33 (and

elsewhere) they appear to allege that the same representation occurred in mid to late-August

2011; in ¶¶ 21 and 39, they fail entirely to state the date(s) of other alleged representations; and,

in ¶ 44, they allege that unidentified "statements" were made sometime during the "Summer of

2011."  These are anything but particularized allegations.  Moreover, it entirely unclear whether

---

[16] "Failure to comply with the pleading requirements of Rule 9(b) is treated as a failure to state a
claim under Rule 12(b)(6)."  Metro Ready Mix, Inc. v. Essroc Cement Corp., 2007 WL 1306595
at *3 (D. Md. Apr. 25, 2007).

the mixture of allegations in the Counterclaim refer to one representation or several representations.

Further, there are no allegations whatsoever as to the <u>place</u> where any of these purported representation(s) occurred.

Finally, the <u>contents</u> of the alleged representation(s) are not pled with particularity. There are general averments of:

(a) "continuous assurances" by Orrstown to "help" the Azadis "complete their projects," but without further factual detail as to the precise nature of the alleged assurances, or how exactly Orrstown intended to "help" Defendants (¶ 21);

(b) a reassurance by Orrstown that it would allow Defendants "time to stabilize their projects and finances," but without any allegation as to what precisely was said about or meant by this (¶ 22);

(c) a supposed "commitment" to fund draw requests related to the bowling alley (¶ 22) and/or the hotel (¶ 43)[17], but without specifying the precise statements made or the context of the alleged commitment (<u>e.g.</u>, whether there was an alleged agreement to fund each and every draw request no matter the amount or circumstances, or whether there were certain restrictions, limitations, or conditions);

(d) a representation that Orrstown would "work with" Defendants "to allow for the projects to stabilize" (¶ 33), but without any allegation as to what was meant by the supposed agreement to "work with" Defendants; and

---

[17] The fact that certain allegations reference a purported commitment to fund the bowling alley, only (¶ 22), while others reference a commitment to fund the bowling alley and the hotel (¶ 43), only underscores the lack of specificity.

(e) "statements in the Summer of 2011" (¶ 44), but without any allegation as to the nature of the alleged statements.

- <u>Defendants have failed to allege the identity of the person who made the alleged false representation(s)</u>. In many instances (<u>see</u>, <u>e.g.</u>, ¶¶ 21, 39, 44), Defendants make general references to alleged representations made by Orrstown without any allegation as to the speaker(s), or, for that matter, the listener(s).

- <u>Defendants have failed to make particularized allegations showing what Orrstown obtained or sought to obtain by making the alleged false representation(s)</u>. There are no particularized allegations showing why Orrstown would have allegedly intentionally misrepresented that it would "work with" Defendants and fund their draw requests for the bowling alley and hotel projects. Defendants broadly assert, in conclusory fashion, that Orrstown would gain some kind of "advantage" by inducing Defendants to "continue to move forward with completion of work on their projects," but there are no additional allegations as to what the "advantage" would have been, or has been.

Further, any claim that Orrstown would reap some benefit by allegedly misrepresenting its intention to fund the projects is undermined, and made entirely implausible, by the fact that Defendants appear to allege that Orrstown stopped funding and declared a default <u>just one week</u> after it purportedly agreed to fund the requests. (Counterclaim at ¶ 33). There is no allegation showing what Orrstown gained, or could have gained, in that one week. <u>Atlantic Forest</u>, 2011 WL 6351851 at *2 ("A complaint must be dismissed if it does not allege 'enough facts to state a claim to relief that is plausible on its face.'").

- <u>Defendants have failed to allege with particularity how they came to rely on Orrstown's alleged false representation(s)</u>. Defendants generally aver that Orrstown's alleged

oral representations induced them to "move forward" with their projects. (Counterclaim at ¶ 55). But there is no allegation specifying <u>what</u> Defendants actually did in moving forward, or <u>when</u> they did it (<u>i.e.</u>, whether it was within the few days between the time of the alleged misrepresentation(s) and the time Orrstown issued default notices, or at some other time). More generally, there is no specific allegation in the Counterclaim stating how Defendants would have acted differently had Orrstown not allegedly agreed to "work with" them. The need for specificity in this regard is heightened by the fact that, as stated above, Defendants appear to allege that their period of "reliance" was just one week. (Counterclaim at ¶ 33).

•     <u>Defendants have failed to allege facts showing that Orrstown's alleged false representation(s) were false when made.</u> The alleged misrepresentation made by Orrstown is promissory in nature, that is, it purported to promise future actions of working with Defendants and funding future construction draw requests. (<u>See, e.g.,</u> Counterclaim at ¶ 52). Alleged misrepresentations about future actions are typically not actionable in fraud. <u>Orteck Int'l Inc. v. TransPacific Tire & Wheel, Inc.,</u> 2006 WL 2572474 at *11 (D. Md. Sep. 5, 2006) ("It is true, as a general rule, that an action for fraud will lie only for misrepresentation of past or existing facts, and that breach of a promise to render a performance in the future is redressable only by an action in contract.").

Under Maryland law, an alleged misrepresentation of a future action is only actionable in fraud if the person "enters an agreement to do something without the present intention of performing." <u>First Union Nat'l Bank v. Steele Software Sys. Corp.,</u> 154 Md. App. 97, 134 (2003), <u>cert. denied</u> 380 Md. 619 (2004). To adequately plead this species of fraud under Fed. R. Civ. P. 9(b), the claimant must allege specific facts and circumstances showing that a promise was made with no intention of fulfilling it. <u>Kwang Dong Pharmaceutical Co. v. Han,</u> 205 F.

Supp.2d 489, 495 (D. Md. 2002) (dismissing fraud claim because the claimant "failed to allege any specific facts" that the defendant never intended to honor the agreements); Metro Ready, 2007 WL 1306596 at *3 (D. Md. Apr. 25, 2007) ("Where a fraud claim . . . contains nothing more than an assertion that [the defendant] had no intention of honoring the contracts at the time they were entered, a claim for fraud cannot be sustained."); Orteck, 2006 WL 2572474 at *12 (merely alleging that the defendant made an agreement that it did not intend to fulfill does not give rise to a fraud claim).

Defendants have failed to meet this pleading burden. They baldly allege, in a single sentence, that Orrstown "knew the representations" (those representations are neither defined nor specified) made to Defendants "were false when they were made." (Counterclaim at ¶ 54). That assertion is simply not sufficient. Nor is it sufficient for Defendants to allege that Orrstown subsequently breached its alleged oral agreement, even if that breach occurred a short time thereafter. (Id.). Alleging that Orrstown breached its purported oral agreement to "work with" Defendants shortly after that alleged agreement was made does nothing to show that, at the time the agreement was made, Orrstown had no intention of fulfilling it. Metro Ready, 2007 WL 1306595 at *4 ("Metro has not alleged or proffered facts to establish that Essroc knew its promise to fulfill the contract was false at the time the promise was made.") (emphasis added).

Accordingly, having failed to plead essential elements of a fraud claim with the particularity required under Fed. R. Civ. P. 9(b), Defendants' alleged claim for fraud should be dismissed.[18] Count II should be dismissed.

---

[18] Defendants' failure to plead damages, discussed below, is an additional basis for dismissing Count II.

**IV.     Defendants have failed to state a claim for non-disclosure (Count III).**

In Count III, Defendants attempt to allege a claim for "non-disclosure," or fraudulent concealment. Specifically, Defendants allege that "Orrstown deliberately failed to disclose a material fact, that fact being that the Bank had made a decision to terminate funding draw requests for [Defendants'] construction projects, planned to call a default and would demand full payment for the alleged credit facilities outstanding." (Counterclaim at ¶ 61).

Fraudulent concealment requires the claimant to plead, inter alia, that the defendant "owed a duty to the plaintiff to disclose a material fact." Blondell, 413 Md. at 119. See also Brass Metal, 189 Md. App. at 354 ("non-disclosure of information does not create a cause of action unless a duty to disclose exists"); Akinkoye v. Wells Fargo Home Mortgage, 2011 WL 6180210 at *5 (D. Md. Dec. 12, 2011) ("A plaintiff who alleges fraud with regard to nondisclosure of material facts must nonetheless show that the defendant owed a duty of care to the plaintiff.").[19]

There is "no general duty upon a party to a transaction to disclose facts to the other party." Sass v. Andrew, 152 Md. App. 406, 430 (2003). Rather, a duty to disclose only arises from "certain relationships, such as a confidential relationship." Brass Metal, 189 Md. App. at 354. Confidential, or fiduciary, relationships are most often "found in attorney-client relationships, trustee-beneficiary relationships, and in some family relationships," but "generally business relationships are not confidential relationships." Id. at 356. "Where businesses are engaged in an arm's length transaction, a confidential relationship does not exist," and, therefore, no duty to disclose exists. Id. at 357.

---

[19] Fraudulent concealment, like fraud, also requires reliance. Blondell, 413 Md. at 119. For the reasons stated above, Defendants have failed adequately to alleged reliance in their Counterclaim.

Orrstown knows of no Maryland law imposing a tort duty on a bank to give its borrowers

advance notice of its intention to declare a default and seek repayment. See Waller, 95 Md. App.

at 212-13 (a bank does not owe a duty under the implied covenant of good faith and fair dealing

to demand payment from a borrower under before initiating collection activities).[20]

Moreover, under Maryland law, there is no confidential or fiduciary relationship between

a lender and a borrower, and there are no duties owed by a lender to a borrower other than those

set forth in the parties' contractual agreements. This was made clear by the Court in Parker, 91

Md. App. 346. There, the plaintiffs sued their lender for fraudulent concealment (and other torts)

in connection with a residential construction loan. Id. at 351. The plaintiffs alleged, generally,

that the lender had failed to disclose certain material facts about its relationship with the home

builder, and its intentions with respect to handling the financing of the project. Id. at 355. The

plaintiffs alleged that the lender made statements that "intentionally cultivated a relationship of

trust and confidence," and that they "came to regard [the lender] as an adviser and consultant

with respect to the project." Id. at 354. The plaintiffs further alleged that the lender represented

that it would "protect" their interests in the project. Id.

The Court in Parker affirmed the dismissal of the plaintiff's fraudulent concealment

claim. Id. at 367-74. The Court held that absent special and unique circumstances, a lender's

duties to a borrower sound only in contract; a lender like Orrstown owes no tort duties, including

duties of disclosure, to borrowers like Defendants. Id. The Court based this holding on the

---

[20] Defendants' allegation that Orrstown "pulled the proverbial rug out from under them, and, on August 26, [2011] issued default notices" (Counterclaim at ¶ 33) is misleading. A review of the default notices issued by Orrstown to Defendants, which are attached as Exhibits 3A-3L to the First Amended Complaint, shows that for nearly every loan, the August 2011 notices constituted requests to cure a default, not an acceleration of the amounts owed. Thus, Defendants were put on notice of their defaults and, where required under the loan documents, given an opportunity to cure before Orrstown accelerated the amounts owed and brought this lawsuit.

"long-standing principle of Maryland law that the relationship of a bank to its customer in a loan transaction is ordinarily a contractual relationship between a debtor and a creditor, and not fiduciary in nature." Id. at 368 (emphasis added). Put otherwise,

> Courts have been exceedingly reluctant to find special circumstances sufficient to transform an ordinary contractual relationship between a bank and its customer into a fiduciary relationship or to impose any duties on the bank not found in the loan agreement.[21]

Id. at 369. "In sum," the Court in Parker concluded, "when no contractual basis for a special duty of care is alleged, a lender owes no duty of care to its borrower." Id. at 374. See also Kiley v. First Nat'l Bank of Maryland, 102 Md. App. 317, 326-27 (1994), cert. denied, 338 Md. 116 (1995) ("the relationship between a bank and its customers, which has been universally recognized, and consistently followed in this State to the present time, is that of debtor and creditor, with the rights between the parties considered as contractual"); Yousef v. Trustbank Savings, F.S.B., 81 Md. App. 527, 536 (1990) ("It is pellucid that, in Maryland, the relationship of a bank to its customer in a loan transaction is ordinarily a contractual relationship between debtor and creditor, and not fiduciary in nature.").[22]

---

[21] The Court in Parker identified four "special circumstances" that could, in the context of a residential construction loan, give rise to a duty of disclosure on a bank. Id. at 370-74. Those circumstances are: (1) the bank "took on extra services" for the borrower above and beyond lending money and the other normal incidents of credit transactions; (2) the bank received "greater economic benefit from the transaction other than the normal mortgage"; (3) the bank "exercised extensive control over the construction" of the home; and (4) the bank was asked by the borrowers of any pending lien actions. Id. There are no allegations in the Counterclaim indicating that any of these circumstances would apply here -- even assuming, arguendo, that these circumstances are applicable beyond residential construction loans.

[22] In Jacques v. First Nat'l Bank of Maryland, 307 Md. 527 (1986), the Court recognized a narrow tort duty for a lender to use reasonable care in processing a loan application, where the bank agreed to use such care. No such facts are alleged here.

Special tort duties are not imposed on a bank merely because the borrower places "trust and confidence in the bank," even if the bank has reason to know that the borrower regards the bank in such a manner. <u>Parker</u> at 369. Rather, in order to impose tort duties on a bank necessary to support a claim like fraudulent concealment, the bank must have made a "conscious assumption of such duties." <u>Id.</u> at 369-70. <u>See also Brass Metal</u>, 189 Md. App. at 359 ("The mere fact that one reposes trust and confidence in another's integrity does not create a confidential relationship").

Under <u>Parker</u>, Defendants' claim for fraudulent concealment cannot be maintained. Defendants allege that Orrstown had a duty to disclose its "decision to terminate funding draw requests" and "call a default" based on "the contractual relationship between the parties and the specific representations made by the Bank in the summer of 2011." (Counterclaim at ¶¶ 60-61). Yet Defendants fail to allege any specific duty imposed on Orrstown as a result of that "contractual relationship" that required it to disclose its intention to halt funding and declare a default. Nor have they alleged a similar disclosure duty undertaken by Orrstown based on any alleged oral representations. Orrstown's alleged agreement to "work with" Defendants does not impose a special tort duty of care or disclosure on the bank, any more so than the lender's statements in <u>Parker</u> that it would "protect" the borrowers' interests.

Defendants also allege that a disclosure duty arose from Orrstown's alleged cultivation of a relationship of "trust and confidence," and their "actual reposing of trust and confidence" in Orrstown. (Counterclaim at ¶ 60). These same allegations were made and rejected in <u>Parker</u>.

Defendants have not alleged facts showing that Orrstown made a "conscious assumption" of any special tort duties.[23]

Accordingly, because Defendants have not alleged any facts showing that Orrstown owed them a tort duty of disclosure that would support a claim for fraudulent concealment, Count III should be dismissed.  Count III should be dismissed.

## V.   Defendants do not allege that they have been harmed.

Finally, Defendants' counterclaims should be dismissed for the additional reason that they have failed to allege any harm resulting from Orrstown's alleged decision to stop funding the bowling alley and hotel projects, or from its alleged misrepresentation of concealment of facts related thereto.

Defendants appear to allege that they have been harmed in four respects: (1) Morris Azadi decided to spend approximately $30,000 of his personal funds to pay subcontractors for work done at the bowling alley (Counterclaim at ¶¶ 28-29); (2) unidentified Defendants decided to spend "$50,000 of personal funds to cover opening expenses for the Bowling Center" (id. at ¶ 32); (3) Defendants were unable obtain a Small Business Administrative Loan for over $1.1 million for the bowling alley (id. at ¶¶ 34-37); and (4) Defendants were unable to obtain a $767,367 tax credit for the hotel (id. at ¶¶ 18, 34-37).[24]

None of these things represents harm to Defendants.  Morris Azadi's alleged voluntarily expenditure of $30,000 to pay unidentified subcontractors was purportedly made because

---

[23] Defendants' failure to plead damages, discussed below, is an additional basis for dismissing Count III.  Moreover, to the extent Defendants are seeking in Count III (or Count II) to enforce an oral "credit agreement," as that term is defined in the Act, or to modify any written credit agreement with an oral agreement, or to assert Count II or Count III as anything more than an attempted set-off to a "concededly enforceable credit agreement," then the Act would serve as an additional basis for dismissal of these claims.

[24] None of these things are alleged to be the result of a fraudulent representation or concealment.

Orrstown declined to fully fund Defendants' draw requests for the bowling alley. (Counterclaim at ¶¶ 28-29). Had Orrstown agreed to fund those requests, Morris Azadi (and/or other Defendants) would still have been required to pay the $30,000, but would have instead paid it to Orrstown (with interest), instead of paying it directly to subcontractors (without interest). This does not represent harm.

Defendants' allegation that another $50,000 was spent for "opening expenses" at the bowling alley also does not adequately plead harm. (Counterclaim at ¶ 32) There is no allegation identifying which Defendant(s) allegedly paid these expenses; no allegation identifying the nature of the "opening expenses"; no allegation that Defendants ever requested funding for the "opening expenses"; and no allegation that these expenses were even eligible for funding under the credit facility(ies) provided by Orrstown for the bowling alley. Moreover, had Orrstown extended credit for this $50,000, the fact is that Defendants (or some of them) would still have been required to pay this amount. The only difference is that instead of paying this amount directly to subcontractors or suppliers (without interest), they would have been required to pay it to Orrstown (with interest). This does not represent harm.

Defendants' alleged inability to secure a Small Business Administration Loan for the bowling alley and tax credit for the hotel also does not represent harm. Defendants allege that they would have simply paid those funds directly to Orrstown in partial satisfaction of their debt; they would not have retained those funds. (Counterclaim at ¶¶ 34, 36). Further, there is no allegation that the loan from the Small Business Administration would have included an interest rate lower than the applicable Orrstown loan(s), such that there is no basis for concluding that Defendants suffered a harm from not being able to pay down their Orrstown debt with new debt from the Small Business Administration. Similarly, because the receipt of the tax credit was

28

dependent upon Orrstown's extension of an additional $600,000 (with interest), and because there is no allegation of when Defendants would have received that tax credit, there is no plausible basis for suggesting that there would have been any net income resulting from the tax credit that could have been paid to Orrstown.

Further, although all Defendants have joined in the counterclaims, it is clear that only a few of them have any ownership interest in the properties that are the subject of the counterclaims, the bowling alley and hotel. The Counterclaim alleges that Morris, Simin, and Ash acquired the hotel (¶ 8), and that Aristodemos Capital Group acquired the bowling alley (¶ 13). The Counterclaim does not allege that any other Defendant has any ownership interest in these properties, making it implausible to suggest that they have been harmed by actions taken in connection with them (or that they have standing to pursue claims related thereto).

At bottom, Defendants' allegations of harm result from Orrstown's decision to cease funding the bowling alley and hotel projects and to declare a default. Yet Defendants do <u>not</u> allege that Orrstown breached any provision of any credit agreement when it took those actions, and they do <u>not</u> dispute that they were in default of those credit agreements. A party does not suffer compensable harm when another party merely exercises its contractual rights.

## Conclusion

For all of the foregoing reasons, Orrstown respectfully requests that the Counterclaim be dismissed with prejudice.

Date:  May 16, 2012                    Respectfully submitted,

                                       /s/  Matthew R. Alsip
                                       _____
                                       Daniel P. Moylan (Bar No. 24719)
                                       Matthew R. Alsip (Bar No. 28002)
                                       Christine C. Carey (Bar No. 29428)
                                       Venable LLP
                                       210 West Pennsylvania Avenue
                                       Suite 500
                                       Towson, Maryland 21204
                                       Telephone: 410-494-6200
                                       Facsimile: 410-821-0147
                                       dpmoylan@venable.com
                                       mralsip@venable.com
                                       cccarey@venable.com

                                       *Counsel for Orrstown Bank*

310959/4