**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(BALTIMORE)**

| | | |
|---|---|---|
| ORRSTOWN BANK | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. 1:12-CV-00345-RDB |
| ARES INVESTMENTS GROUP, et al., | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

**DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO VACATE OR, IN THE ALTERNATIVE, TO OPEN CONFESSED JUDGMENTS**

Defendants Ares Investment Group, LLC ("Ares"); Aristaeus, LLC ("Aristaeus"); Aristodemos Capital Group, LLC ("Aristodemos"); Ariston Real Estate Group, LLC ("Ariston"); Catania USA, LLC ("Catania"); Have A Bowl, LLC ("Have A Bowl"); Northwind Townhomes, LLC ("Northwind"); Polar, LLC ("Polar"); and Ugo, LLC ("Ugo") (collectively, the "Entity Defendants" or, alternatively, the "Azadi Entities"), and Morris Azadi ("Morris"), Ash Azadi ("Ash"), and Simin Azadi ("Simin") (collectively, the "Individual Defendants" or the "Azadis" and together with the Entity Defendants, collectively, the "Defendants"), by their undersigned counsel, submit this Reply to Plaintiff's Opposition to Defendants' Motion to Vacate or, in the Alternative, to Open Confessed Judgments and state as follows:

**OVERVIEW**

Contrary to the rhetoric of Plaintiff Orrstown Bank ("Orrstown," the "Bank," or "Plaintiff"), which assails the Defendants' Motion to Vacate or, in the Alternative, to Open Confessed Judgments (the "Motion to Vacate"), the facts detailed in the Motion to Vacate and the First Amended Answer to Complaint for Confession of Judgment and Breach of Contract and Counterclaim (the "Answer and Counterclaim"),

support various "meritorious defenses" within the contemplation of Local Rule 108(1)(b) and the substantive aspects of Maryland Rule 2-611 and the attendant caselaw, such that this Court should vacate, or, in the alternative, open or modify, the confessed judgments. Specifically, the Plaintiff's Complaint lacks the requisite specificity under both Local Rule 108 and Maryland Rule 2-611; the Defendants' Answer and Counterclaim sufficiently pleads counterclaims sounding in breach of the implied covenant of good faith and fair dealing, intentional misrepresentation, and non-disclosure; also this Court has the authority to strike the confessed judgments due to the Plaintiff's failure to redact confidential information. For any one or all of these reasons, this Court should vacate, or, in the alternative, open or modify, the confessed judgments.

## ARGUMENT

**I.** **Because the Defendants Have Sufficiently Pled Meritorious Defenses, and Because There Exists an "Actual Controversy" Thereon, this Court Should Vacate, or, in the Alternative, Open or Modify, the Confessed Judgments**

Local Rule 108(1)(d) provides that an application to vacate, open, or modify a confessed judgment "shall be made on the ground that the defendant has a meritorious defense to the cause of action." Rule 108(1)(e) provides that, "[i]f the evidence presented establishes that there are substantial and sufficient grounds as to the merits of the case, the Court *shall* order the judgment by confession vacated, opened, or modified . . . ." (Emphasis added). The Motion to Vacate detailed with specificity various legally cognizable, meritorious defenses, the merits of which are "substantial" and "sufficient." Orrstown's Opposition misapprehends the applicable rules and fails to recognize that, indeed, the Motion to Vacate meets the standard for obtaining an order vacating the confessed judgments.

### A.   *Lack of Specificity under this Court's Local Rules*

Local Rule 108(1)(a) provides:

A complaint requesting the entry of judgment by confession shall be filed by the plaintiff accompanied by the written instrument authorizing the confession of judgment

and entitling the plaintiff to a claim for liquidated damages and supported by an affidavit made by the plaintiff or someone on that party's behalf stating the ***specific circumstances*** of the defendant's execution of said instrument and including, where known, the age and education of the defendant, and further including the amount due thereunder . . . .

The Bank fails to state the specific circumstances.  The Plaintiff does nothing more than speak in very general terms regarding the Defendants' execution of the loan documents.  Such general statements include:

- Complaint at ¶ 8:  "Since early 2007, Orrstown has extended numerous commercial loans and lines of credit to Defendants, the total principal amount of which is nearly $16 million."

- Complaint at ¶ 9:  "Five of the loans and lines of credit were requested by Defendants and extended by Orrstown for the purposes of financing two real estate development projects in or near Hagerstown, Maryland . . . ."

- Miller Affidavit at ¶ 6:  "[The Azadis] are capable of understanding the loan documents attached to the Complaint, and voluntarily executed these loan documents."

In its Memorandum of Law in Opposition to Defendants' Motion to Vacate or, in the Alternative, to Open Confessed Judgments (the "Plaintiff's Opposition"), the Plaintiff makes a number of strained arguments in support of its assertion that Orrstown has provided the requisite specific circumstances surrounding the execution of the alleged loan documents.  First, Plaintiff incorrectly states, "Local Rule 108 simply requires that the affidavit 'include[e] [sic] the amount due.'"  Plaintiff's Opposition at 8.  Simply put, the Plaintiff has distorted the rule; again, the Rule requires an explanation of "the specific circumstances of the defendant's execution of said instrument and including, where known, the age and education of the defendant, and ***further including the amount due thereunder*** . . . ."  (Emphasis added).[1]  Rule 108 does not define "specific circumstances" as "the amount due thereunder"; rather, Rule 108 requires the Plaintiff

---

[1]       The Plaintiff dismisses as a "red herring" the Defendants' contention that "the confessed judgment should be vacated because the affidavit does not state the 'specific circumstances' related to the execution of each of the dozens of credit agreements at issue in this case," stating boldly that "[t]he circumstances of their execution of the agreements are irrelevant."  Plaintiff's Opposition at 10-11.  How the circumstances surrounding the documents' execution can be "irrelevant" and a "red herring," is preposterous considering the plain text of Local Rule 108 requires an explanation of "the specific circumstances of the defendant's execution of said instrument . . . ."

to state "the amount due thereunder" ***in addition to*** explicitly explaining the "specific circumstances of the defendant's execution of [the] instrument."   The Plaintiff's misguided attempt to equate "specific circumstances" with "the amount due thereunder" would render the words "further including" meaningless, and this Court should refuse to give the Rule such a reading.  *See Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (citing the "rule against superfluities" which holds that a statute or rule "should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant") (internal quotation marks omitted)).   Accordingly, by doing nothing more than specifying the total amount due for each purported loan document, it cannot be said that the Plaintiff has done "more than enough to satisfy Local Rule 108 . . . ."  Plaintiff's Opposition at 8.

> Further, the Plaintiff avers:

> Orrstown has provided sufficient detail to permit Defendants to verify whether the principal and interest claimed for each loan and line of credit has been properly calculated. Defendants already know (or should know) that the total amount Orrstown has lent to them based on their own records, or based on the credit agreements attached to the First Amended Complaint.  Likewise, Defendants already know (or should know) the dates and amounts of their payments, again based on their own records.  Additionally the interest rate applicable to each credit agreement is specified on the face of the documents, and Orrstown disclosed the per diem rate applicable to each loan and loan of credit.  Armed with this information, Defendants should be able to independently verify Orrstown's calculation of the total amount of principal and interest due under each loan and line of credit.

(Internal citations omitted).   The crux of this misguided argument is that, because the Defendants purportedly have the capability to ascertain the amounts due under the purported loan documents, the Plaintiff somehow is absolved from following the mandates of Local Rule 108.   The Rule, however, requires an affidavit explaining the "the specific circumstances of the defendant's execution of [the] instrument," ***with no mention of what information the Defendants may have at their disposal***.   In pursuing a confessed judgment, a plaintiff is required to provide how it calculated the debt alleged; ***it should not be a guessing game for the defendant***.   Recognizing that its Complaint and supporting Affidavit were

insufficient, the Plaintiff grasps for straws in arguing that information purportedly at the Defendants' disposal alleviates the Bank of its obligation to comply with Local Rule 108.  The text of the Rule mandates the opposite conclusion.  Therefore, having failed to detail the requisite "specific circumstances of the defendant's execution of [the] instrument," this Court should vacate the confessed judgments.

**B.**     ***Protections  of Maryland Rule 2-611 Also Apply under the Twin Aims of the* Erie *Doctrine***

The Plaintiff attacks the Defendants reliance on Maryland Rule 2-611, claiming that "[t]his federal Court is not controlled by a Maryland rule of procedure, and, thus, these proceedings are not governed by Maryland Rule 2-611."  Plaintiff's Opposition at 7.  The Plaintiff is incorrect to quickly dismiss Rule 2-611 as a "rule of procedure."[2]

Although, it is well settled that *Erie* [*R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)] mandates that a federal court sitting in diversity apply the substantive law of the forum State, absent a federal statutory or constitutional directive to the contrary," *Salve Regina College v. Russell*, 499 U.S. 225, 226 (1991), "[t]his procedural as opposed to substantive distinction is not always easy to apply . . . ."  *Stonehocker v. Gen. Motors Corp.*, 587 F.2d 151, 154 (4th Cir. 1978); *see Nationwide Mutual Ins. Co. v. Welker*, 792 F. Supp. 433, 438 (1992) ("Determination of whether a particular law is 'substantive' or 'procedural' for *Erie* purposes is troublesome.").  That said, although not "mechanically applied," in *Guaranty Trust Co. v. York*, 326 U.S. 99 (1945), the Supreme Court developed the "outcome-determinative test" to be applied in determining whether a state law or rule is substantive versus procedural.  Under the outcome-determinative test, "where a law would determine the outcome of litigation, it [i]s held to be substantive."  *Davison v.*

---

[2]     That the Maryland Rules may affect substantive, and not merely procedural, rights, is hardly a novel concept. *See Admur v. Lizars*, 372 F.2d 103, 107-08 (4th Cir. 1967) (holding that former Maryland Rule 328b, requiring security in derivative suits where the plaintiff shareholder owns less than 5% of the stock, "is a substantive right, not merely a regulation of procedure") (internal quotation marks omitted).

*Sinai Hosp. of Baltimore, Inc.*, 462 F. Supp. 778, 780 (D. Md. 1978).

More recently, courts within the Fourth Circuit have refined the analysis of the outcome-determinative test, to evaluate whether its roots, the twin aims of *Erie*, are being met.  *See Knauer v. Johns-Manville Corp.*, 638 F. Supp. 1369, 1374 (D. Md. 1986) (stating that the procedural versus substantive determination "should not be made on a talismanic analysis of the outcome determination factor alone, but instead by consideration of the compatibility of the choice with *Erie*'s twin aims: discouragement of forum shopping and avoidance of inequitable administration of the laws.") (internal quotation marks omitted); *see also Powell v. Media Gen. Ops., Inc.*, No. 7:10-3170, 2011 U.S. Dist. LEXIS 116352, *5-*6 (D.S.C. Apr. 26, 2011) ("State law is considered 'substantive' when it is 'outcome determina[tive] — i.e., applying it would produce a different result than if federal law applied — and that fact implicates the twin aims underlying the *Erie* rule: discouragement of forum shopping and avoidance of inequitable administration of the laws.") (some internal quotation marks and modifications omitted).

Applying the outcome-determinative test (as modified by subsequent caselaw) to Rule 2-611 reveals that the Rule is substantive, not procedural.  That is, Rule 2-611(a) prescribes the form of the affidavit supporting a complaint for confessed judgment precisely for the protection of the defendant. Under Rule 2-611(b), where the complaint and the affidavit do not "compl[y] with section (a)," the circuit court "shall dismiss the complaint."  Thus, for instance, where the affidavit does not "[s]tate the dates and amounts of all payments made and show the computation of all interest and attorneys' fees claimed," a complaint supported by such an affidavit is subject to dismissal under the Maryland Rules and should be treated likewise in federal court.  To the extent this Court does not construe Local Rule 108 to require the same specificity as Md. Rule 2-611 and would not require dismissal of the Complaint under the instant circumstances, the application of Maryland Rule 2-611 should be construed as "outcome determinative,"

and, thus, substantive in nature.  *See J.D. Holdings, LLC v. BD Ventures, LLC*, 766 F. Supp. 2d 109, 113-14

(D.D.C. 2011) (quoting *FDIC v. Deglau*, 207 F.3d 153, 159 (3d Cir. 2000)) ("Judgment by confession is a

product of state law, having no analog in the federal rules . . . the state's Rules of Civil Procedure prescribe

the procedures and filing prerequisites for obtaining confessed judgments . . . .").

Furthermore, construing Rule 2-611 as substantive is consistent with *Erie*'s twin aims:

discouragement of forum shopping and avoidance of inequitable administration of the laws.  As to the

former, holding Rule 2-611 to be procedural, in diversity cases, would encourage banks to file confessed-

judgment suits in federal court, where the form-affidavit requirement of Rule 2-611(a) would not apply.  As

to the latter, applying different standards in Maryland's state and federal courts naturally would further an

"inequitable administration of the laws."  *See Knauer*, *supra*.

Though rooted in the procedural rules, Maryland Rule 2-611 provides substantive protections, and

thus is applicable in the instant matter, and the Plaintiff has failed to meet the Rule's requirements.  As

explained in the Motion to Vacate – and not refuted in the Plaintiff's Opposition – if the total amount

claimed is something other than the face amount of the instrument upon which the suit is brought, the

affiant must set forth how the total claim is computed.  *See* Md. Rule 2-611(a)(5).  Simply put, neither the

Complaint nor the Affidavit of Terry W. Miller (the "Miller Affidavit")[3] sets forth the interest rate for any of

the notes or how the interest and late charges were calculated, and the appraisal fees and attorneys' fees are

included in summary form only, with no support given detailing of the fees.[4]  Whether applying Local Rule

---

[3]     The Miller Affidavit was attached as Exhibit 4 to the Complaint.  [D.I. 26-38].

[4]     The Plaintiff asserts that the "Defendants . . . do <u>not</u> contest as unreasonable the amount of attorneys' fees claimed by Orrstown -- they merely seek more information," and that "[i]n the absence of a direct challenge to the reasonableness of the claimed fees (and without any evidence supporting an argument that the requested fees are unreasonable), Defendants have failed to meet their burden of establishing a meritorious defense."  Plaintiff's Opposition at 10.  This argument is a *non-sequitur*; of course, the Defendants cannot fashion an argument (or support such an argument with evidence) that the attorneys' fees are unreasonable, if they are left in the dark as to how they were calculated.

108 or Maryland Rule 2-611 (or both), the Plaintiff has failed to satisfy its burden for entry of a confessed

judgment.  Accordingly, the confessed judgments entered against the Defendants should be vacated.

C.      ***The Defendants Possess Meritorious Counterclaims that Serve as a Set-Off Against Any and All of the Confessed Judgments***

As explained in the Motion to Vacate and the Answer and Counterclaim, and as explained below,

the Defendants have successfully pled a number of counterclaims that may serve as a set-off against the

confessed judgments.

### i.      Breach of contract

To survive a motion to dismiss with respect to a breach of contract claim, "Maryland law requires

that a plaintiff . . . 'must of necessity allege with certainty and definiteness facts showing a contractual

obligation owed by the defendant to the plaintiff and a breach of that obligation by defendant.'"  *Polek v.*

*J.P. Morgan Chase Bank, N.A.*, 424 Md. 333, 362, 36 A.3d 399, 416 (2012) (quoting *Cont'l Masonry Co.*

*v. Verdel Constr. Co.*, 279 Md. 476, 480, 369 A.2d 566, 569 (1977)).  Yet, "[a]t this stage, [Plaintiff] does

not have to forecast evidentiary support for her allegations."  *Swedish Civil Aviation Admin. v. Project*

*Mgmt. Enters., Inc.*, 190 F. Supp. 2d 785, 792 (D. Md. 2002).

The Plaintiff complains that "the Counterclaim is ambiguous as to the nature of the alleged oral

agreement that forms the basis of Count I," and that such ambiguity "warrants dismissal."  Memorandum of

Law in Support of Motion to Dismiss Counterclaim (the "Motion to Dismiss") at 9.  Yet, in Paragraph 22 of

the Answer and Counterclaim, cited and quoted in the Plaintiff's Motion to Dismiss, the Defendants state:

> In late July 2011, Selders introduced John Nickey and a new hire of Orrstown,
> Terry Miller ("Miller").  At that meeting, which Ash Azadi attended, the Defendants
> reminded the Bank that a Small Business Administration Loan in excess of $1.1 Million
> (the "SBA "Loan") was imminent, but that a notice of default from the Bank would
> jeopardize the loan.  During this meeting, Miller specifically reassured the Azadis, and,
> through them, their entities, that the Bank would allow them time to stabilize their projects

> and finances *and the Bank would honor its commitment to fund the draw requests for the completion of the Bowling Center*.

Answer and Counterclaim at ¶ 22 (emphasis added); *see* Ash Azadi Affidavit at ¶ 20 (same); Motion to Vacate at 18 ("At bar, the Bank's actions in refusing to fund the loans, despite direct representations to the contrary . . . frustrated the very purpose of the lending relationship . . . ."). Thus, in no uncertain terms, the Defendants unambiguously assert that the parties agreed that Orrstown would fund future draw requests so as to not jeopardize the SBA Loan or the opening of the Bowling Center. In Paragraph 26 of the Answer and Counterclaim, the Defendants allege that some of such draw requests ultimately were denied. Accordingly, the Defendants have met their burden of alleging "with certainty and definiteness facts showing a contractual obligation owed by the defendant to the plaintiff and a breach of that obligation by defendant."[5] *Polek*, *supra*.

Further, contrary to the Plaintiff's assertion, the Defendants' breach of contract claim is not barred by the Maryland Credit Agreement Act (the "Act"), Md. Code, Cts. & Jud. Proc. Art. § 5-408 (2006 Repl. Vol.). To this point, the Court of Appeals of Maryland's opinion in *Pease v. Wachovia SBA Lending, Inc.*, 416 Md. 211, 6 A.3d 867 (2010) is dispositive. In *Pease*, a couple – guarantors on a SBA loan financing their purchase of a plumbing business – appealed from the trial court's denial of their motion to open, modify or vacate a confessed judgment entered against them. *Id.* at 213, 6 A.3d at 868. In their motion, they argued that the trial court erroneously relied on the Act in refusing to consider allegations that the

---

[5]    By way of comparison, in *Smith-Anthony v. Buckingham Mortgage Corp.*, No. 09-0698, 2009 U.S. Dist. LEXIS 72073, *6 (D. Md. Aug. 13, 2009), this Court dismissed a breach of contract claim, where the plaintiff alleged that "(1) she had a 'contractual relationship with each Defendant,' (2) the 'Defendants owed [her] a contractual obligation,' and (3) she suffered financial harm due to the 'Defendants' material breaches.'" (Internal modifications omitted). In the Answer and Counterclaim, the Defendants do far more than make such conclusory statements; rather, they provide specific facts as to the contractual relationship between the parties and how the Plaintiff breached this relationship. Indeed, the Plaintiff appears to concede this point, stating that "[t]he alleged misrepresentation made by Orrstown is promissory in nature, that is, it purported to promise future actions of working with Defendants and funding future construction draw requests." Motion to Dismiss at 21.

lender fraudulently and negligently induced them to enter into a series of loans.  *Id.*  The Court of Appeals

granted *certiorari* to determine whether

> the [Maryland Credit Agreement Act] which bars enforcement of credit
> agreements, unless the agreements are in writing, and the CSA decision in [*ST Sys. Corp.
> v. Md. Nat'l Bank*, 112 Md. App. 20, 684 A.2d 32 (1996)] prohibit tort claim defenses to a
> bank's confessed judgment claim where the defendants allege the bank violated standard
> banking practices to fraudulently and negligently induce a borrower to accept the bank's
> loan of over $1 million dollars.

*Pease*, 416 Md. at 220, 6 A.3d at 872.

In rejecting the precise argument upon which the Plaintiff now relies, the Court of Appeals

explained:

> The filing of offensive counterclaims using the tort theories of negligence, fraud,
> and breach of fiduciary duty would be on the basis that, as the Peases acknowledge, any
> recovery on such claims would serve as a set-off against any judgment on the guarantees in
> favor of Wachovia.  Accordingly, where such counterclaims are allowed to be filed, the
> Peases would not seek thereby to enforce or modify an oral agreement, but would be
> asserting such claims notwithstanding the implicitly conceded enforceability of the credit
> agreement . . . .  Because the Peases would be asserting the counterclaims against
> Wachovia for negligence, fraud, and breach of fiduciary duty, ***not to enforce a verbal
> agreement to borrow or to modify their existing agreement to borrow, but to constitute a
> set-off against any recovery obtained by Wachovia under a concededly enforceable
> credit agreement, these counterclaims plainly are not the sort of situation to which the
> General Assembly intended the Act apply***.  As such, § 5-408(b), which serves as the Act's
> statute of frauds, does not bar at the threshold the Circuit Court from considering the
> Peases' allegations—in assessing the legal sufficiency of whether the appropriate legal
> theory of each counterclaim states a prima facie cause of action— as grounds to open,
> modify, or vacate the confessed judgment.

*Pease*, 416 Md. at 226-27, 6 A.3d at 876-77 (internal citations omitted).  Although the Court stated that "*if*

the [defendants] were asserting the counterclaims as a means to defeat directly or attain a modification of

the credit agreement . . ., the . . . [Act] would be triggered and bar consideration of the underlying

allegations," Motion to Dismiss at 12 (quoting *Pease*, *supra*) (emphasis added), the Court held that, in

asserting counterclaims against the lenders, the borrowers, as a matter of law, were *not* attempting to modify

- 10 -

a credit agreement. *See Pease*, 416 Md. at 227, 6 A.3d at 876-77. Therefore, as in *Pease*, in filing the offensive counterclaims, the Defendants are not "seek[ing] thereby to enforce or modify an oral agreement, but are asserting such claims notwithstanding the implicitly conceded enforceability of the credit agreement." *Pease, supra*. Thus, it is well settled under Maryland law that the Act does not operate as a bar to the breach of contract claim (or any other claim, for that matter).[6,7]

### ii.      Breach of implied covenant of good faith and fair dealing

The Plaintiff makes a number of misguided arguments in asserting that the Defendants have failed to state a claim for breach of the implied covenant of good faith and fair dealing. First, the Plaintiff cites a number of cases that purportedly stand for the proposition that the "implied covenant of good faith and fair dealing cannot be maintained when the underlying express contract is unenforceable, including when that contract is unenforceable based upon a statute of frauds like the [Maryland Credit Agreement] Act." Motion to Dismiss at 14. As explained *supra*, the Act does not operate to bar the Defendants' breach of contract claim, and therefore, reliance on such caselaw is unavailing.

---

[6]      The Plaintiff relies on a number of pre-*Pease* cases to support its argument on this point, including *Kuecher v. Peoples Bank*, 602 F. Supp. 2d 625 (D. Md. 2009); *Dupont Heights Ltd. Partnership v. Riggs National Bank of Washington, D.C.*, 949 F. Supp. 383 (D. Md. 1996); *Howard Oaks, Inc. v. Maryland National Bank*, 810 F. Supp. 674 (D. Md. 1993). Neither *Kuecher* nor *Dupont Heights* involved a borrower's attempt to assert counterclaims to serve as a setoff and a "meritorious defense" to a confessed judgment. Rather, in those cases, this Court held that the Act operates as a bar to plaintiff-borrowers seeking to enforce alleged oral representations that would have constituted a modification to the pertinent credit agreements. *See Kuechler*, 602 F. Supp. at 631-32; *Dupont Heights*, 949 F. Supp. 388-89. Further, to the extent *Howard Oaks* is inconsistent with the Court of Appeals's subsequent opinion in *Pease*, *Howard Oaks* should be given no precedential weight.

[7]      While *Pease* only dealt with the extent to which the Act barred the "filing of offensive counterclaims using the tort theories of negligence, fraud, and breach of fiduciary duty" – and not a claim for breach of contract. There is no principled reason, however, to limit the Court of Appeals's holding in *Pease* to tort claims. *See Pease*, 416 Md. at 226, 6 A.3d at 876. As the borrowers in *Pease*, the Defendants assert the breach of contract claim, "not to enforce a verbal agreement to borrow or to modify their existing agreement to borrow, but to constitute a set-off against any recovery obtained . . . ." *Id.* at 227, 6 A.3d at 877. In fact, in *Pease*, the Court of Appeals noted that "'[c]ounterclaim' has been defined as 'the assertion of a right to have an affirmative judgment against the adversary *based upon a setoff* . . . .'" *Id.* at 226 n.9, 6 A.3d at 876 n. 9 (quoting *Imbesi v. Carpenter Realty Corp.*, 357 Md. 375, 380, 744 A.2d 549, 552 (2000)). Thus, those successful in prosecuting *any* counterclaim are entitled to a setoff (and thus, have a "meritorious defense" sufficient to open, modify, or vacate a confessed judgment), regardless of whether the counterclaim is *ex contractu* or *ex delicto*.

As to the merits of the claim, Maryland law is clear that "[e]ven when the parties are silent on the issue, the law will impose an implied promise of good faith." *Port E. Transfer, Inc. v. Liberty Mutual Ins. Co.*, 330 Md. 376, 485, 624 A.2d, 520, 524 (1993). This duty or promise "'prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract.'" *E. Shore Markets, Inc. v. J.D. Assocs., Ltd.*, 213 F.3d 175, 182 (4th Cir. 2000) (quoting *Parker v. Columbia Bank*, 91 Md. App. 346, 366, 604 A.2d 521, 531 (1992)). In the present case, the Answer and Counterclaim and the Motion to Vacate expressly assert that the Plaintiff's conduct was directly responsible for Defendants' inability to perform their obligation under the contracts – *i.e.*, to re-pay the loans. *See* Motion to Vacate at 20 (citing "the behavior of Orrstown in frustrating the purpose of the contractual relationship between the parties and thwarting the Defendants' very ability to pay off the loans"); Affidavit of Ash Azadi (the "Ash Azadi Affidavit")[8] at ¶ 32 ("The default notices immediately jeopardized the SBA Loan for over $1.1 Million that the Azadis has secured for the Bowling Center and substantially would have reduced the Defendants' alleged debt to the Bank."). That is, as a result of the Plaintiff's breach of the agreement to continue to fund the Defendants' draw requests, the Defendants were unable to obtain a tax credit from the Hamilton Project and an SBA Loan for over $1.1 million – funds that would have been available to pay over to Orrstown. *See* Answer and Counterclaim at ¶¶ 36, 46, 48, 49; Motion to Vacate at 20; Ash Azadi Affidavit at ¶¶ 32, 35.

The Plaintiff complains that, "under such a theory, <u>every</u> bank would be subject to a claim for breach of the implied covenant in <u>every</u> instance where it stopped funding a development . . . ." Motion to Dismiss at 16. This is simply untrue. Rather, under such a theory, every bank is subject to a claim for breach of the implied covenant in every instance where it (1) materially misrepresents to the borrower that it

---

[8]       The Ash Azadi Affidavit refers to the affidavit attached as an exhibit to the Memorandum of Points and Authorities in Support of the Motion to Vacate. *See* D.I. 23-2.

will continue funding the borrower's projects; (2) actually stops funding the borrower's projects; (3) and causes the borrower to lose out on tax credits and other loans, the proceeds of which would be used to perform under the borrower's agreement with the lender. For the above-stated reasons, the Motion to Vacate and the Answer and Counterclaim, in asserting a viable counterclaim for breach of the implied duty of good faith and fair dealing, has proffered a meritorious defense sufficient to vacate or, in the alternative, open or modify the confessed judgments.

### iii. Intentional misrepresentation

In arguing that the Defendants have failed to state a claim for intentional misrepresentation, the Plaintiff first asserts that the Defendants have failed to specify the time/date of the misrepresentations.[9] Yet, in the Answer and Counterclaim, the Defendants state that information thusly:

> **In late July 2011**, Selders introduced John Nickey and a new hire of Orrstown, Terry Miller ("Miller"). At that meeting, which Ash Azadi attended, the Defendants reminded the Bank that a Small Business Administration Loan in excess of $1.1 Million (the "SBA "Loan") was imminent, but that a notice of default from the Bank would jeopardize the loan. During this meeting, Miller specifically reassured the Azadis, and, through them, their entities, that the Bank would allow them time to stabilize their projects and finances and the Bank would honor its commitment to fund the draw requests for thee completion of the Bowling Center.

Answer and Counterclaim at ¶ 22 (emphasis added);[10] *see* Ash Azadi Affidavit at ¶ 20 (same); Motion to Vacate at 21. That is, by stating clearly that the Plaintiff's misrepresentations were made in late July 2011, the Defendants have met the pleading requirements of Rule 9 of the Federal Rules of Civil Procedure. As

---

[9] As explained *supra*, the Maryland Credit Agreement Act does not operate as a bar to Defendants' intentional misrepresentation claim.

[10] The Plaintiff is incorrect in stating that, in Paragraph 33 of the Answer and Counterclaim, the Defendants "allege that the same representation occurred in mid to late-August 2011 . . . ." Motion to Dismiss at 18. Paragraph 33 reads: "Only one week after Miller gave specific assurances that the Bank would work with its borrowers to allow for the projects to stabilize, Miller pulled the proverbial rug out from under them and, on August 26, 2012 issued default notices to the Azadi Entities and the Azadis." Thus, the August 2012 date referenced the date on which the Plaintiff issued default notices, and *not* the date on which the Plaintiff materially misrepresented to the Defendants that it would continue to fund Defendants' draw requests.

this Court has held, a party alleging fraud need not detail "the exact date and time of each . . . misrepresentation" in order to satisfy the mandates of Rule 9(b). *ISP Techs., Inc. v. Capricorn Pharma, Inc.*, No. 11-0023, 2011 U.S. Dist. LEXIS 69447, *16 n.8 (D. Md. June 28, 2011) (quoting *Nahigian v. Juno Loudon, LLC*, 684 F. Supp. 2d 731, 738-39 (E.D. Va. 2010)).   In *ISP Technologies, Inc.*, a plaintiff contended that a defendant made intentional misrepresentations in order to induce the plaintiff to enter into certain loan agreements. *ISP Techs., Inc.*, 2011 U.S. Dist. LEXIS 69447 at *15.  In response, the defendant contended that the misrepresentation claim should be dismissed as not being pled with particularity under Rule 9(b).   *Id.*   In holding that the plaintiff's "allegations sufficiently state a claim for intentional misrepresentation and satisfy Rule 9 (b)," the Court noted that that plaintiff had sufficiently pled the "time" of the misrepresentations, when the plaintiff stated that such misrepresentations occurred "[d]uring the negotiations of the . . . Loan Agreement." *Id.* at *16. Specifically, in a footnote, the Court cited *Nahigian*, *supra*, for the proposition that "Rule 9 (b) does not require 'the exact date and time of each . . . misrepresentation,' and may be satisfied when the plaintiff 'named the entity, though not the specific person, making the misrepresentations' . . . ." *Id.* at *16 n.8.

Similarly unavailing is the Plaintiff's contention that the "<u>contents</u> of the alleged representation(s) are not pled with particularity."   Again, Paragraph 22 of the Answer and Counterclaim, the Motion to Vacate and the Ash Azadi Affidavit each states: "Miller specifically reassured the Azadis, and, through them, their entities, that the Bank would allow them time to stabilize their projects and finances and the ***Bank would honor its commitment to fund the draw requests*** for the completion of the Bowling Center." (Emphasis added); *see* Ash Azadi Affidavit at ¶ 20 (same); Motion to Vacate at 21 ("In meeting with the Defendants . . . the Bank asserted that it would work with the Azadis and their Entities to fund the projects, giving assurances that funding would continue to flow.").   Simply put, Orrstown, through Miller, promised

the Defendants that it would continue funding draw requests.   This specific statement satisfies the particularity requirements under Rule 9, and the statement is not merely a "general averment."   *See* Motion to Dismiss at 19.

Further, contrary to the Plaintiff's Opposition, the Defendants have not "failed to allege the identity of the person who made the alleged false representation(s)."   Motion to Dismiss at 20.   The Answer and Counterclaim is crystal clear that it was Terry Miller, an employee of Orrstown, that made the misrepresentations to the Defendants regarding the continued approval of draw requests.   *See* Answer and Counterclaim at ¶ 22 ("Miller specifically reassured the Azadis . . . that . . . the Bank would honor its commitment to fund the draw requests . . . ."); *see* Ash Azadi Affidavit at ¶ 20 (same).   Even so, naming the entity is sufficient.   *See ISP Techs., Inc.*, 2011 U.S. Dist. LEXIS 69447 at *16 n.8 (quoting *Nahigian*, *supra*).

Next on the list of the Plaintiff's inaccurate arguments is the Plaintiff's contention that the counterclaim for intentional misrepresentation must be dismissed because "there is no allegation specifying <u>what</u> Defendants actually did in moving forward" – *i.e.*, how the Defendants detrimentally relied on Miller's misrepresentations.   Yet, in Paragraph 23 of the Answer and Counterclaim, as well as in the Motion to Vacate and the Ash Azadi Affidavit, the Defendants state that, in light of Miller's misrepresentations, "the Azadi Entities continued to pursue the construction of their projects, most notably the Bowling Center, committing to pay contractors on the jobsites and incurring the obligations related thereto."   *See* Motion to Vacate at 21 ("The Azadis and their entities felt comforted by the repeated assurances of Orrstown and its principal representatives and continued its efforts to complete the recreation center on the Bowling Center and the Hamilton projects as well as continued to pursue the SBA Loan."); *see also* Ash Azadi Affidavit at ¶ 21 ("[T]he Azadi Entities continued to  pursue the construction of their

projects, most notably the Bowling Center, committing to pay contractors on the jobsites and incurring the obligations related thereto."). Therefore, the Defendants detrimentally relied upon the misrepresentations, as the Azadis' continuation of their construction projects was contingent on receiving continued approval for draw requests.

Also, the Plaintiff avers that "[t]here are no particularized allegations showing why Orrstown would have allegedly intentionally misrepresented that it would 'work with' Defendants and fund their draw requests for the bowling alley and hotel projects." Motion to Dismiss at 20. To this point, in the Motion to Vacate, the Defendants explicitly state that "[t]he Bank made the false representation clearly for the purpose of getting said Defendants to push as far along as possible on their projects in the hopes of completing it, so as to facilitate the Bank maximizing its position, even at the further risk of its borrowers." Motion to Vacate at 21. That is, despite intending to declare Defendants in default under the purported loan documents, it was nevertheless in the Plaintiff's interest to have the Defendants' projects progress as far as possible so as to maximize the value of said projects should the Plaintiff institute foreclosure proceedings upon the property securing the loan documents. Therefore, contrary to Plaintiff's claim, the Defendants have proffered a "particularized allegation[] showing why Orrstown would have allegedly intentionally misrepresented that it would 'work with' Defendants and fund their draw requests for the bowling alley and hotel projects." *See* Motion to Dismiss at 20.

Finally, to the Plaintiff's allegation that the Defendants "have failed to allege facts showing that Orrstown's alleged false representation(s) were false when made," Motion to Dismiss at 21, courts around the country have noted that, "[s]ince intent to defraud is generally not susceptible to direct proof, it usually must be proven by circumstantial evidence." *Coffel v. Stryker Corp.*, 284 F.3d 625,634 (5th Cir. 2002); *see Performance Printing Corp. v. Upper Deck Co.*, No. 3:98-CV-0035, 1999 U.S. Dist. LEXIS 4250, *8

(N.D. Tex. Mar. 29, 1999) ("Because a party will rarely be able to produce direct evidence of fraudulent intent, it will in most cases have to rely on circumstantial evidence."); *Cent. Tex. Micrographics v. Leal*, 908 S.W.2d 292, 299 (Tex. App. 1999) ("Intent not to perform a promise when it was made may be proved by circumstantial evidence and may be inferred from the party's subsequent acts."); *Super Valu Stores v. Peterson*, 506 So. 2d 317, 333 (Ala. 1987) (holding that "a plaintiff may establish intent to deceive through circumstantial evidence relating to events occurring *after* the representation was made").[11]   At present, mere days after representing to the Defendants that Orrstown would continue funding the Defendants' draw requests, the Bank decided to stop funding such draws, declared default, and demanded payment on all of the alleged loans.  A reasonable trier of fact could infer from such strong circumstantial evidence that, at the time of the representations regarding the funding of further draw requests, Orrstown had no intention of following through on its word.  Accordingly, for all of the above reasons, the Defendants sufficiently have pled their counterclaim sounding in fraud / intentional misrepresentation.

### iv.        Non-Disclosure

The sum and substance of the Plaintiff's argument vis à vis the non-disclosure claim is that, such a claim may only lie where the non-disclosing party owes the other party a duty of disclosure by virtue of a confidential or fiduciary relationship, and that, at present, no such relationship exists.[12]   *See* Motion to Dismiss at 23-27.

It is well-settled in the Fourth Circuit that "special circumstances" may exist to transform the contractual relationship between a bank and its customer to that of a confidential or fiduciary nature.  The

---

[11]       In other contexts, the Fourth Circuit similarly has held that evidence of fraudulent intent may be proven by circumstantial evidence. *See, e.g.*, *United States v. Cabe*, 57 F. App'x 542, 545 (4th Cir. 2003) (quoting *United States v. Bales*, 813 F.2d 1289, 1294 (4th Cir. 1987) ("This court has held that 'fraudulent intent' "may be established by circumstantial evidence and by inferences deduced from facts and situations.''').

Fourth Circuit has recognized that such special circumstances may exist "when there is a long-term relationship between the bank and the customer and the customer justifiably relies on the bank for advice concerning financial matters. *Am. Model Home Corp. v. Resource Mortgage Cap.*, No. 98-1396, 1999 U.S. App. LEXIS 2849, *13 (4th Cir. Feb. 24, 1999). In the instant case, such special circumstances exist to transform the relationship between Orrstown and the Defendants into a fiduciary one, such that Orrstown owed the Defendants a duty of disclosure. Of course, such a duty of disclosure was breached when Orrstown failed to disclose the material fact that it had made a decision to terminate funding draw requests for the Defendants' projects, to call a default, and to demand full payment on the alleged loans. *See* Answer and Counterclaim at ¶ 61; Motion to Vacate at 5; Ash Azadi Affidavit at ¶ 20.

Specifically, Orrstown and the Defendants enjoyed a "long-term relationship," *Am. Model Home Corp.*, *supra*, having done business together for over five (5) years. Further, Orrstown was aware of the vulnerable position the Defendants found themselves, being on the cusp of opening the Bowling Center, and regarding the imminent receipt of the SBA Loan and a valuable tax credit. In fact, the Plaintiff has been aware of the Defendants' vulnerability since at least June of 2010, when Ash Azadi sent an e-mail to Jeffrey Embly, the Bank's CFO, explaining the Defendants' precarious position and proposing a method for resolving the difficulty. *See* Motion to Vacate at 4; Ash Azadi Affidavit at ¶ 15. Aware of such circumstances, and how a defunding of future draw requests negatively would affect the Defendants' ventures, Orrstown deliberately failed to disclose to the Defendants that they already had decided to terminate funding future draw requests, instead, fraudulently misrepresenting to the Defendants that they would, in fact, continue funding such requests. The Plaintiff's knowledge of the precarious circumstances facing the Defendants and the import of continued funding related thereto constitutes sufficient "special

---

[12]     As explained *supra*, the Maryland Credit Agreement Act does not operate as a bar to Defendants' non-disclosure claim.

circumstances" to transform the relationship between Orrstown and the Defendants into a fiduciary one, such that Orrstown owed the Defendants a duty of disclosure. Again, this duty was breached when Orrstown failed to disclose the material fact it had made a decision to terminate funding draw requests. Accordingly, the Defendants sufficiently have pled their claim for fraudulent non-disclosure.

**v.      Allegations of Harm**

Defendants argue that all of the counterclaims "should be dismissed for the additional reason that they have failed to allege any harm resulting from Orrstown's alleged decision to stop funding the bowling alley and hotel projects, or from its alleged misrepresentation of concealment of facts related thereto." Motion to Dismiss at 27.

Although the Plaintiff is free to disagree with the extent of the damage the Defendants asserted, it cannot seriously argue that the Defendants "have failed to allege any harm . . . ." *Id.* Below is a summary of the asserted harm, count-by-count:

- **Count I:  Breach of Contract Including Implied Covenant of Good Faith and Fair Dealing**
  - "The violation of the implied covenant in Orrstown's contractual undertaking to fund the projects, not to mention the subsequent assurances . . . frustrated the Defendants' right to receive the fruits of the contract . . . ." Motion to Vacate at 20.
  - "[T]he Counterplaintiffs were damaged by, among other things, the inability to obtain the SBA Loan for the Bowling Center and an historic tax credit on the Hamilton Project." Answer and Counterclaim at ¶ 46.
  - "Counterplaintiffs additionally have been damaged by having to draw down personal resources to pay for project costs." Answer and Counterclaim at ¶ 47.
  - "Among other losses, the Counterplaintiffs have suffered, thus far due to the Bank's breach, the inability to get the historic tax credit for the Hamilton Project, or the SBA Loan and the loss of personal lines of credit with the Bank and the expenditures of personal funds needed to cover projects to be funded by the Bank, which costs would not have been incurred had the Bank not failed to meet its obligations." Answer and Counterclaim at ¶ 48.
- **Count II: Intentional Misrepresentation**
  - "When the Bank proverbially pulled the rug out from under the Defendants, the inability to consummate the SBA Loan required the use of personal funds for the business projects even going so far as the Azadis drawing down personal lines of credit with other banks,

and losing an opportunity to recover a tax credit for the Hamilton Project in the amount of nearly $800,000." Motion to Vacate at 21.

o   "The Bank's misrepresentations forced the Azadis to choose between paying subcontractors for whom draw requests were denied, from personal funds to the extent available, or risk the unpaid subcontractors walking off the job, refusing to honor warranties or filing suit." Answer and Counterclaim at ¶ 56.

o   "As a result, of the intentional misrepresentations by Orrstown, Counterplaintiffs have incurred damages, including, but not limited to, out of pocket losses, as well as the delay, if not the loss, of the SBA Loan and the historic tax credit." Answer and Counterclaim at ¶ 58.

- **Count III:  Non-Disclosure**
  o   "As Ash Azadi has affirmed, Defendants did move forward with the various projects based on the expressions of assurance from the Bank and as a result suffered damages, including the expenditure of personal funds, the onset of litigation by Olympic Electric, the apparent loss of the historic tax credit for the Hamilton Project and the inability to obtain, thus far, the SBA Loan that was within reach." Motion to Vacate at 22.

  o   "As a result of the intentional misrepresentations by Orrstown, Counterplaintiffs have incurred damages, including, but not limited to, out of pocket losses, as well as the delay, if not the loss, of the SBA Loan and the historic tax credit." Answer and Counterclaim at ¶ 62.

Furthermore, even if unsuccessful in proving these well-pled accusations of damage, the Defendants, if ultimately successful in prosecuting the counterclaims, would be entitled to nominal damages. *See Taylor v. NationsBank, N.A.*, 365 Md. 166, 175, 775 A.2d 645, 651 (2001) ("[I]t is well settled that where a breach of contract occurs, one may recover nominal damages even though he has failed to prove actual damages."); *MacCubbin v. Wallace*, 42 Md. App. 325, 328, 400 A.2d 461, 464 (1979) (noting that intentional torts "carry with them a presumption of injury, upon proof of which, at least nominal damages must be awarded").  In summary, the Defendants have alleged that the Plantiff's breach of its agreement to continue funding future draw requests and its fraudulent misrepresentation and non-disclosure related thereto caused the Defendants to suffer extensive out-of-pocket expenses, and jeopardized their ability to obtain an SBA Loan and substantial tax credit, which could and would have been used to pay the Bank.  This pleading, therefore, is in full compliance with the Rules.

###### vi.    The Meritorious Counterclaims Can Serve as a Set-Off Against Any and All of the Confessed Judgments

Finally, the Plaintiff argues, generally:

> [A]lthough all Defendants have joined in the counterclaims, it is clear that only a few of them have any ownership interest in the properties that are the subject of the counterclaims, the bowling alley and the hotel. . . .   The Counterclaim does not allege that any other Defendant has any ownership interest in these properties, making it implausible to suggest that they have been harmed by actions taken in connection with them (or that they have standing to pursue claims related thereto).

Plaintiff's Opposition at 14.   Yet, elsewhere in its pleadings, the Plaintiff relies upon and admits the interconnectivity between all of the loans and the Defendants.   For example, in explaining why, in calculating the amount of attorneys' fees allocated to each loan, the Bank divided the total amount of attorneys' fees by the number of loans (as opposed to recording the actual time spent on each loan, the Plaintiff states:   "It would be impossible . . . to apportion the time spent preparing the Complaint by somehow calculating precisely how many minutes were spent on one loan, as opposed to another loan . . . . *In reality, these loans comprise a single loan portfolio extended by the same bank to the same group of related individuals and entities*."   Plaintiff's Opposition at 10 n.7 (emphasis added).   The Plaintiff cannot have it both ways.   Likewise, the liability alleged for the loans extends not just to the owner of each project but, essentially, to each and every Defendant as an alleged borrower or guarantor.   Consequently, the damage suffered by one is suffered by all.

## II.    Defendants Have Not Released Their Meritorious Defenses and Counterclaims

The Plaintiff argues that "this Court should reject each and every defense asserted by Defendants in their Motion to Vacate for the simple reason that they [except UGO, LLC] previously released those defenses."   Plaintiff's Opposition at 4.   For the reasons described below, the Defendants have not waived the defenses asserted in the Motion to Vacate.

A.     *The Releases Do Not Bar the Assertion or Enforcement of Claims That Had Not Yet Accrued As of the Date of the Release*

The Defendants do not contest that, contained with each of the various Modification and Assumption Agreements, was a general release provision.  It is hornbook contract law, however, that "[e]ven a general release will not be construed to bar the enforcement of a claim that had not accrued as of the date of the release."  *Hintz v. Prudential Ins. Co. of Am.*, 687 F. Supp. 2d 772, 801 n.22 (N.D. Ill. 2009) (quoting 29 RICHARD A. LORD, WILLISTON ON CONTRACTS § 73:10 (4th ed. 2003)); *see Bowersox Truck Sales v. Harco Nat'l Ins. Co.*, 209 F.3d 273, 279 (3d Cir. 2000) (quoting *Restifo v. McDonald*, 230 A.2d 199, 201 (Pa. 1967)) ("'[T]he general words of the release will not be construed so as to bar the enforcement of a claim which has not accrued at the date of release.'"); *Xerox Corp. v. Media Scis., Inc.*, 609 F. Supp. 2d 319, 326 (S.D.N.Y. 2009) (noting that courts, in the antitrust field, have refused to enforce general releases that act to waive or immunize parties from liability for future violations); *Farm Credit Bank v. Whitlock*, 581 N.E.2d 664, 667 (Ill. 1991) ("A general release is inapplicable to an unknown claim."); *see also* 66 AM. JUR. 2D RELEASE § 28 ("[A] release will not be read to include matters that the parties had no intention to dispose of and will not be construed so as to bar the enforcement of a claim that has not accrued at the date of release.").

In the instant case, the Plaintiff's breach of the covenant of good faith and fair dealing, material misrepresentations and non-disclosure supporting the Defendants' claims occurred in July of 2011, undoubtedly after the execution of the Modification and Assumption Agreements in January and June of 2011.  Accordingly, Defendants' claims had not yet accrued at the effective date of the releases, and, thus, are not released.

Additionally, under Maryland law, exculpatory agreements or releases cannot, as a matter of law, release future intentional, reckless, or gross conduct.  *See Winterstein v. Wilcom*, 16 Md. App. 130, 136, 293

A.2d 821, 824-25 (1972) ("[E]xculpatory agreements otherwise valid are not construed to cover the more extreme forms of negligence — wilful, wanton, reckless or gross.  Nor do they encompass any conduct which constitutes an intentional tort."); *see Seigneur v.  Nat'l Fitness Inst., Inc.*, 132 Md. App. 271, 282, 752 A.2d 631, 637 (2000); *Boucher v. Riner*, 68 Md. App. 539, 543, 514 A.2d 485, 488 (1986); *see also Lee v. Beauchene*, 337 N.W.2d 827, 828 (S.D. 1983).  As such, Defendants' fraud and non-disclosure claims – *i.e.*, intentional torts – were not released as a matter of law.

**B.     *The January 12, 2011 Purported Modification and Assumption Agreement is Not Supported by Consideration***

In support of its argument that the January 12, 2011 purported Modification and Assumption Agreement is supported by adequate consideration, the Plaintiff argues:

> [T]he face of this Modification and Assumption Agreement recites the fact that it was supported by consideration.  It starts:  "NOW, THEREFORE, in consideration of these premises [sic], and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows[.]  Defendants are presumed to have read this provision prior to executing the document.  Defendants have therefore conclusively acknowledged that the Modification and Assumption Agreement is supported by consideration, and are now estopped from arguing otherwise.

Plaintiff's Opposition at 12.

In *Reece v. Reece*, 239 Md. 649, 658, 212 A.2d 468, 473 (1965), the Court of Appeals of Maryland squarely rejected the precise argument upon which the Plaintiff relies.  There, the Court explained:

> [A]lthough some courts have said that the promisor is "estopped" to deny the statement that he has received consideration, or that the presumption arising from the recital of consideration is "irrebuttable," most states, including Maryland, hold that the parol evidence rule does not prevent a rebuttal of the truth of that statement . . . .

*Id.*; *see Venners v. Goldberg*, 133 Md. App. 428, 441, 758 A.2d 567, 574 (2000) (quoting *Deutser v. Marlboro Shirt Co.*, 81 F.2d 139, 142 (4th Cir. 1936) (applying Maryland law)) ("'[T]he recitals in a written instrument as to the consideration received are not conclusive, and it is always competent to inquire into the

consideration and show by parol or other extrinsic evidence what the real consideration was.'"); *Russ v. Barnes*, 23 Md. App. 691, 697, 329 A.2d 767, 770 (1974) ("A court of conscience may inquire into the consideration upon which a contract is based even though it recites value received and is under seal, nor is [it] immune from challenge for want of consideration."); *see also In re Fleming*, No. 95-5617, 1997 WL 111302, *7 (Bankr. D. Md. Jan. 7, 1997) ("Even where a deed of trust is under seal and recites value received it may nonetheless be challenged for lack of consideration."). Accordingly, the Plaintiff's argument that, as a matter of law, the January 12, 2011 Modification and Assumption Agreement was supported by adequate consideration must be rejected, and the Court should rule that the release contained therein as to the post-agreement claims is null and void.

### III. This Court Has the Authority to Strike the Confessed Judgments Due to the Plaintiff's Failure to Redact Confidential Information

In its Opposition, the Plaintiff attempts to shift the blame for its own carelessness in failing to redact loan account numbers, employer identification numbers, and Social Security Numbers of the Individual Defendants, which was a violation of Rule 5.2 of the Federal Rules of Civil Procedure and the Local ECF Electronic Filing Requirements and Procedures for Civil Cases. The Plaintiff claims that the Defendants' decision to raise the issue regarding the issue relating to Plaintiff's disclosure of confidential information more than five weeks after being served with the Complaint and supporting documents – *i.e.*, in the filing of the Motion to Vacate – was a "strategic attempt to vacate the confessed judgments . . . ." Plaintiff's Opposition at 15.

Of course, it is the filing party's continuing obligation – and not that of the opposing party – to file unredacted pleadings, and to ensure that pleadings containing any information do not remain available for the public to view. Plain and simple, it is the Plaintiff that failed to take any action for more than five weeks, not the Defendants. The Plaintiff's argument on this point is consistent with the theme of the

Plaintiff's Opposition – that its failures should be projected onto the Defendants.  That is hardly the case.  It is within the discretion of this Court to strike the Plaintiff's confessed judgment, and the Defendants request this Court to do just that.  *See* ECF Procedure Manual *at* § IV.B ("[O]n its own initiative or at the request of a party, the court may strike the document [of] . . . any party failing to redact such information.") (emphasis added).

## IV.  CONCLUSION

The Defendants sufficiently have pled a number of counterclaims, any one of which may serve as a set-off sufficient to order the confessed judgments vacated, or, in the alternative, opened or modified.  In light of the foregoing facts and points of authority, the Motion to Vacate should be granted.

Respectfully submitted,

/s/ Gary S. Posner
Paul M. Nussbaum (Bar No. 04394)
Gary S. Posner (Bar No. 05863)
Alan C. Lazerow (Bar No. 29756)
Whiteford, Taylor & Preston L.L.P.
Seven Saint Paul Street
Baltimore, Maryland 21202
Telephone:  (410) 347-8700
Facsimile:  (410) 223-4394
Facsimile:  (410) 223-4306
pnussbaum@wtplaw.com
gposner@wtplaw.com
alazerow@wtplaw.com

*Counsel for the Defendants*

2005913

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 15th day of June, 2012, a copy of the foregoing *Reply to Plaintiff's Opposition to Defendants' Motion to Vacate or, in the Alternative, to Open Confessed Judgments* was sent, via the Court's ECF system, electronic mail and first class, United States mail, postage prepaid, to:

> Daniel Patrick Moylan, Esquire
> Matthew Ryan Alsip, Esquire
> Christine C. Carey, Esquire
> Venable LLP
> 210 W. Pennsylvania Avenue
> Suite 500
> Towson, Maryland  21204

/s/ Gary S. Posner
Gary S. Posner